**In the Matter of LUMARA FOODS OF AMERICA, INC., dba Arthur Treacher's Fish & Chips, Debtor and Debtor in Possession.**

**LUMARA FOODS OF AMERICA, INC., dba Arthur Treacher's Fish & Chips, Plaintiff,**

**v.**

**The UNION SAVINGS & TRUST CO., nka Bank One of Eastern Ohio, N.A., Defendant/Third Party Plaintiff,**

**v.**

**LUMARA FOODS, INC., et al., Third Party Defendants.**

**Bankruptcy No. B82–946–Y.**
**Adv. No. 483–0312.**

United States Bankruptcy Court, N.D. Ohio.

Sept. 26, 1985.

Michael A. Gallo, Nadler & Nadler Co., L.P.A., Youngstown, Ohio, for plaintiff.

Thomas C.B. Letson, David A. Detec, Leonard W. Stauffenger, Letson, Griffith, Woodall & Lavelle, Warren, Ohio, for defendant.

Joan Turner, for Richard D. Goldberg, Youngstown, Ohio, for third party defendants Louis G. DiNardo and Lumara Foods, Ltd.

## MEMORANDUM OF DECISION

JAMES H. WILLIAMS, Bankruptcy Judge.

Lumara Foods of America, Inc., dba Arthur Treacher's Fish & Chips (America) is a debtor before this court in a voluntary proceeding commenced by it under Chapter 11 of Title 11 of the United States Code. In its first several months as a debtor in possession, America devoted itself to the usual activities associated with a Chapter 11 proceeding aimed primarily at getting its house in order with a view toward emerging from Chapter 11 protection as a viable, reorganized entity. Its officers evidently concluded that a cause of action existed against the Union Savings & Trust Co., nka Bank One of Eastern Ohio, N.A. (the Bank or, for the sake of consistency with the testimony and exhibits, its former commonly used appellation, Union Savings). Consequently, America brought a complaint against the Bank, asserting that a series of checks drawn against America's account at the Bank had been cashed, despite the fact that the checks in question bore the forged signature of an authorized signator. The complaint demanded judgment in the amount of $813,767.37, plus interest, the total of the checks which America claimed Union Savings had improperly charged against its account.

Union Savings answered, denying the essential allegations against it, reciting certain affirmative defenses and set up its third party complaints against entities known as Lumara Foods, Inc. (Lumara, Inc.), Lumara Foods, Ltd. (Limited), Louis G. DiNardo, JBC Investments, Inc. (JBC) and Home Savings & Loan Company, the last mentioned third party defendant being ultimately dismissed from the proceedings.

Extensive discovery was undertaken with the entire fact-finding process considerably complicated by the absence from the United States of Robert T. Moosally who will be shown to have been a key figure in the troubled and tangled history of America and related entities. Moosally was, in fact, a fugitive sought by the Federal Bureau of Investigation whose efforts to avoid prosecution took him to such countries as Saudi Arabia and Lebanon. He was finally located and prevailed upon to provide a deposition in Yugoslavia, a surprising turn of events which accounted for still another delay in commencing the trial of these proceedings.

Finally, a five-day trial was conducted, with the parties having consented to the matter being heard and finally determined by this court, pursuant to 28 U.S.C. § 157(c)(2). Moosally was, by the time the trial commenced, back in the United States, in federal custody and appeared as a witness in the case.

This memorandum will constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) F.R.Civ.P., made applicable herein by Bankruptcy Rule 7052.

## I

## HISTORY OF LUMARA FOODS OF AMERICA

Because the court deems an understanding, to the extent possible, of the relationship between America and various predecessor and sister entities to be crucial to the disposition of the issue before it, an attempt will be made to trace the origins of the debtor corporation.

Robert T. Moosally and Louis G. DiNardo, in May of 1981, formed Lumara, Inc. for the purpose of owning and operating several outlets in Youngstown, Ohio under franchises granted by the Church's Fried Chicken organization. At the time, DiNardo was employed by the State of Ohio Department of Liquor Control. Moosally

had been engaged in several businesses, none of which was connected with the fast food industry. While nominally, Moosally and DiNardo were equal partners in the Lumara, Inc. venture, with each owning half of the issued stock and sharing equally the corporate offices, Moosally, in fact, loaned DiNardo most of the latter's share of the capitalization costs. They divided duties and responsibilities, with DiNardo being responsible for construction oversite, and later, general routine administrative duties. Moosally attended to the financial affairs of the business.

DiNardo and Moosally founded another entity in February of 1982, a limited partnership named Lumara Foods, Ltd. (Limited). Limited's purpose was to own and operate seven Arthur Treacher's Fish & Chips (Treacher's) fast food franchise outlets in the Youngstown area. The Limited partners included DiNardo's wife, Moosally's relatives and business associates, James Cataland who was Moosally's attorney and Cataland's inlaws. DiNardo and Moosally were the general partners in charge of day-to-day operations and, again, Moosally provided the funds for DiNardo's share of the investment, as well as that of Mrs. DiNardo and for a substantial portion of the other Limited partners' shares. Both Lumara, Inc. and Limited were located in the building on Market Street in Youngstown that housed several of Moosally's other business ventures.

During the course of their acquisition of the Treacher's outlets in Youngstown, DiNardo and Moosally learned that Treacher's parent company, Mrs. Paul's Kitchens, Inc. (Mrs. Paul's), was seeking a buyer for the nationwide chain of Treacher's outlets. DiNardo, Moosally and Cataland began negotiations for such a purchase in March of 1982. Mrs. Paul's at that time had ongoing litigation seeking recovery of approximately 20 million dollars of unpaid franchise royalties. The Treacher's operation had substantial financial liabilities and Mrs. Paul's proposed a sale involving the assumption of those liabilities. Moosally was required to pledge the assets of some of his other entities, including JBC, Lumara, Inc. and several others. Upon the advice of

Cataland, who felt he would be able to settle the litigation with the franchises with a highly favorable result, DiNardo and Moosally accepted the offer. The timing of the acquisition was attractive inasmuch as it occurred during the Lenten season, which was traditionally a high demand period for the Treacher's fish products. An early, high volume of revenue could therefore be anticipated.

The sale was formally completed on April 1, 1982, and arrangements were made to transfer the operations from Mrs. Paul's in Philadelphia to Youngstown, the same to be housed in the Moosally office building on Market Street. America was formed as the operating entity of the national chain with stock ownership divided equally among Cataland, DiNardo and Moosally. Moosally was designated as president and treasurer, DiNardo became the vice president and Cataland was named secretary. America's operations formally began as of April 1, 1982.

## II

### RELATIONSHIP WITH THE BANK

Among the many early problems of the new corporation was the urgent need to make rental payments for approximately 120 leased outlets. America obviously needed a banking relationship and Moosally appeared at Union Savings to discuss the opening of a checking account and a plan to deal with the pressing rental payment problem. Moosally met with Donald Campbell, executive vice president of the bank, who was well acquainted with Moosally who had been doing business with Union Savings since the early 1970's. Both Lumara, Inc. and Limited already had their operating and payroll accounts with Union Savings and Campbell directed the opening of the America account and set up a system whereby the rental obligations could be paid. This entailed rent checks being written on existing Lumara, Inc. checks which, when ultimately presented by the lessors for payment, would be covered by a transfer of funds, upon Campbell's order, from the America account to the Lumara, Inc.

account. America had sufficient funds to accomplish this task because of the seasonal high sales volume and the process was apparently successfully executed.

## III

## BANK OPERATIONS: BUSINESS CHECKING ACCOUNTS

Substantial trial time was devoted to the manner in which Union Savings handled business checking accounts. A card, bearing the signatures of all persons authorized to sign checks on behalf of the account holder, was essential to the system. As a practical matter, an account could be opened upon receipt of essential information as to the account holder, a deposit and a "temporary" signature card with at least one authorized signature thereon together with the printed or typed names of other signatories. This temporary card would, normally, remain in effect for a brief period of time until the fully executed permanent card was supplied. The Bank also required a resolution of authority to open an account in the case of a corporate depositor. The resolution would supply information regarding the authorized signatories and the number thereof required on a check. Upon receipt of the permanent signature card, the Bank would place it in the account holder's file to be readily accessible when the Bank's employees sought to verify signatures on checks presented for payment. The permanent card would also be microfiched and placed in the Bank's records. At that point, the temporary signature card, being no longer useful, would be destroyed.

A check presented for payment would first be encoded for computer purposes and then sent to the bookkeeping department so that the actual physical inspection of the check could take place. The inspection would determine, among other things, the authenticity of signatures of drawers by a comparison with the signature card on file and whether the requisite number of signatures of drawers were present.

The Bank would occasionally accommodate individual customers. For example, the testimony indicated that a Limited check with one signature was presented for payment, but the Limited account had at that time a two-signature requirement. A bank employee telephoned the Limited office for instructions and was authorized to pay on the check. The Bank did so, but the employee made a notation on the check which memorialized the fact that Limited officials had authorized the payment.

As will be discussed *infra*, a considerable period of time elapsed between the commencement of America's banking relationship with Union Savings and the date of the Bank's receipt of the only permanent signature card presently in existence. To permit America's check-writing operation to go forward pending receipt of the permanent card, the Bank relied on Moosally's status as a longtime substantial customer of the Bank and its knowledge of him and his several companies' affairs. Signatures on checks drawn on the America account could be, and apparently were, examined by comparing permanent signature cards in the Bank's files for other Moosally-related entities. This was feasible because, in general, all of the signators were the same on each company's account.

## IV

## OFFICE PROCEDURE

At the outset of America's operations on April 1, 1982 at the Market Street location in Youngstown where the other Lumara and most of Moosally's other enterprises were located, there were only four employees charged with administering the various businesses. These were, in addition to DiNardo and Moosally, Jody Musitano and Janice Voytilla. Given the size of the staff when the take-over of the national chain of Treacher's occurred, the absorption of the operation produced a situation at the Market Street address variously described in testimony as hectic and chaotic. It was necessary immediately, for example, to disburse the rent checks as previously mentioned, various creditors and suppliers had to be contacted and reassured of the continuing existence of the Treacher's business, bank accounts had to be established

in the localities of the various outlets scattered across the nation and the corporate headquarters operations of the chain had to be phased in to the existing situation at the Market Street location.

Business, from the standpoint of revenue being generated, was good. Cataland testified that during the first ten days of America's operations, approximately one million dollars was received. A practical concern was the development of a means by which the income could be channeled to the Youngstown headquarters. At first, the individual Treacher's units would make their daily deposits in their local banks; from that point the deposits would be wire transferred to either the Huntington Bank in Columbus, Ohio or the BancOhio National Bank in Niles, Ohio; these banks would in turn transfer the deposits to Union Savings. Later, the process was refined so that the wire transfers would be made directly from the unit banks to Union Savings.

The burden of preparing and signing checks fell on Musitano and Voytilla as DiNardo and Moosally were forced to spend much time away from the office as they attempted to establish their chain of restaurants. Customarily, prior to the formation of America, the Lumara entities generally employed a two-signature requirement for the drawing of checks. Without addressing at this point the important question as to whether this requirement was in place insofar as the America checking account was concerned, the evidence indicated that all but one check of the many written on the America account prior to April 28, 1982 contained the signatures of two individuals.

Musitano, in particular, had significant duties beyond those involved with preparing and signing checks. She is a certified public accountant who was hired by Moosally in February, 1982. From her hiring until May of that year, when she became a formal employee of America, she was on the Lumara, Inc. payroll. Regardless of her payroll status, she performed various duties for Lumara, Inc., Limited and America. The Treacher's takeover significantly complicated her job in its accounting aspects. In addition to participating in the transfer of the operation from Philadelphia to Youngstown, Musitano was obliged to formulate an accounting strategy for the America operation.

Voytilla is Moosally's sister and had been employed by him for his various entities, including the Lumara-related companies. Her duties involved primarily bookkeeping functions, including the preparation of checks.

As shown, DiNardo's general role in the entities in which he was involved had to do primarily with the field operations. Testimony at trial indicated that DiNardo did not examine the checkbooks, nor did he review the monthly bank statements. Financial and business strategy were, so far as DiNardo was concerned, in Moosally's realm.

The testimony makes clear that Moosally was unquestionably the dominant force in the operation of America and the other entities in which he had invested. DiNardo's role was so passive that the testimony of several witnesses suggested that persons doing business with America were unaware that DiNardo was even an officer and shareholder. In general, the other participants in the America operation deferred to Moosally's expertise in business and his willingness to take charge of the affairs of the various enterprises. DiNardo's statement that "whatever Bobby says is okay" appears to have been a view generally held within the companies.

The non-Lumara Moosally entities included JBC, Rollerworld, Buckeye Photo, Champion Manner, Glenwood Manner and Concept One. Despite most of these enterprises being officed at the Market Street address, their books and records were kept separately. The evidence suggests that one of them, JBC, was the only active entity during the commencement of America's operations. JBC had also been a customer of the Bank, and as of April, 1982, was indebted to the Bank for an amount exceeding $1,500,000.00, the result of several loans. JBC's financial performance was weak, a fact of which the Bank was

aware and Campbell informed Moosally that further financial aid for the Lumara entities was contingent upon the reduction of the JBC indebtedness.

Moosally procured a loan for America in the amount of $230,000.00. He deposited the proceeds in the America checking account. He next drafted an America check, payable to himself, in the sum of $144,-000.00. Depositing that check in his personal account, he wrote a check to JBC for the same amount, $144,000.00. JBC then used the proceeds of Moosally's check to pay off part of its indebtedness to the Bank. The Bank's anxiety about the JBC loan was thus alleviated by funds initially procured for America.

The testimony of several witnesses indicated that the transfer of funds among Moosally's various entities was a common occurrence, even before America was formed. Incredibly enough, the testimony further established that each business day began with a review of which of the entities was in immediate need of funds and whichever had the greater need would receive transfers from one of the others! The Bank had at least some knowledge of this process and, probably because of Moosally's status as a longtime customer, every effort was made to accommodate him. Thus, if a check from one of the entities was presented for payment and funds were not sufficient in that account to make payment possible, the Bank, rather than return the check to the payee for lack of sufficient funds, would, through an employee, telephone the Market Street office, advise of the situation and hold the check until sufficient funds were deposited into the account in question via the transfer process. During April of 1982, this procedure occurred repeatedly. Thus, the volume of inter-company transfers was frequent and continued until sometime in May of 1982 when Campbell reported to Cataland that Moosally had been "kiting" checks.

The evidence shows that historically there was a large number of transfers between Moosally's personal account and his various entities, including those related to America. These transfers were common

knowledge among the employees with the result that Musitano was able to testify that "this is the way Bob always did business."

## V

### THE CHECKS

This lawsuit focuses on seventeen checks written on the America account between April 7, 1982 and April 22, 1982. All bear the alleged signatures of two authorized signers. However, it is undisputed and is in fact the subject of a stipulation by and between the parties that "[t]he signature as appearing on the checks annexed to Exhibit 'A' of Plaintiff's complaint purporting to be the signature of Louis DiNardo was affixed by Janice Voytilla." Voytilla's signature also appears on the same checks. The payees on these checks were Limited, Lumara, Inc., JBC, Rollerworld and Moosally. DiNardo and Cataland were unaware until June of 1982 that large amounts of funds were leaving America through its checking account and it was not until August of that year that they learned that DiNardo's signature had been forged. When Cataland confronted Moosally concerning the checks, Moosally admitted that they were written by Voytilla under his orders and he agreed to make repayment to America. He executed a note in the amount of $250,000.00 and surrendered his stock certificate to Cataland. In February of 1983, counsel for America informed the Bank of the forgeries.

## VI

### DISCUSSION

While admitting that one of the two signatures on the seventeen checks was forged, the Bank asserts that they were nevertheless properly payable because, in reality, the America account required but one valid signature on checks drawn against it. America counters that while eventually a one-signature requirement became effective, up until April 28, 1982, two valid signatures of authorized drawers had to appear on any America check for it to be properly payable. Since this was not the

case, with the checks in question, it is America's view that Union Savings is liable for the sums represented by those checks.

The testimony is conflicting. DiNardo and Cataland insist that the corporate resolution and permanent signature card they remember signing contemplated that the America account would be a two-signature account; Moosally was as adamant that but one signature was necessary from the account's inception. Musitano's testimony supported Moosally's; the Bank officials who appeared could not recall the number of signatures necessary on the America account in its earliest days; and Voytilla's testimony on the issue was confused and of little assistance. Neither party has records which would assist the court as the only permanent signature card possessed by the Bank is dated May 12, 1982 and requires but one signature. As noted, upon receipt of that permanent card, the temporary version was destroyed. Pertinent corporate resolutions are apparently unavailable.

America contends that its opening of a two-signature account would have been consistent with both the practice of both Limited and Lumara, Inc. Secondly, America relies heavily on the fact that all seventeen checks had, in fact, two signatures. America contends that Moosally and Voytilla obviously believed that the America account carried this requirement as otherwise it would have been superfluous for Moosally to have directed Voytilla to affix both hers and DiNardo's signatures to the checks which the uncontroverted testimony shows that he did.

The Bank, on the other hand, relies, not unexpectedly, on the permanent signature card in its records and additionally points out that after April 28, 1982 and prior to May 12, 1982, when the permanent card was received by it, checks were presented with but one signature of a drawer. The Bank asserts that this establishes that the temporary signature card most certainly would have reflected that but one signature was required.

Second, evidence was adduced to show that when the America account was opened, Moosally ordered checks to be printed which contained only one signature line. This, the Bank contends, is consistent with its suggestion that Moosally intended to open a one-signature account.

Finally, the Bank asserts that it would have been impractical for America to have required two individuals to execute its checks because of the substantial volume of checks to be written. The Bank answers the obvious question of why, then, were two signatures placed on the checks in question by relying on the testimony of Musitano and Voytilla to the effect that the chaotic state of affairs in early April prevented them from carefully deliberating as to which accounts required two signatures and which did not and to be safe rather than sorry they simply placed two signatures on all America checks. Indeed, the evidence showed that a few checks contained two signatures until June of 1982, a month after America's permanent signature card was received by the Bank, by which time the account required, everyone agrees, only one signature. Musitano and Voytilla offer the interesting explanation for this vagary by explaining that these checks were used to pay a particularly recalcitrant creditor who often stopped at the Market Street offices demanding payment. Musitano and Voytilla would turn him away by falsely informing him that America checks required two signatures and since a second authorized signer was unavailable, payment to the creditor would have to be delayed.

America offered testimony showing errors and inconsistencies between the orders for checks and their actual form as presented, indicating that the single signature line printed on the checks was of no particular significance. Indeed, the evidence demonstrated that just such an error had occurred with the Lumara, Inc. payroll account. There, despite the fact that the payroll account admittedly required but one signature, the actual checks printed for the account contained two signature lines. This error, as counsel for America suggests, shows that the number of signature lines on the checks is hardly dispositive of

the issue of the number of signatures required.

### A.

■ The court agrees with America's assertion that its account required two signatures from its inception at least until April 28, 1982. It is the court's opinion that Moosally's contemporaneous behavior in directing the addition of a second, albeit bogus, signature is the best indicator of the status of the America account at that time. So also, Jody Musitano's and Janice Voytilla's contemporaneous actions likewise indicate that the key parties operated under the assumption that the America account began with a two-signature requirement. Regarding Musitano's and Voytilla's excuse that an excessive work load deprived them of sufficient time to think about the number of signatures required by the various accounts with which they were dealing, the court adopts America's counsel's statement on the subject:

> It is submitted that given the other elements of Janice's [Voytilla's] testimony relating to the time of the takeover of the business, when manpower shortages existed making it difficult to get two signatures, and that things were generally hectic; and, given the magnitude of the checks involving the Debtor, vis-a-vis the relatively nominal activity of the other entities, it would not have been a task of significant proportion to recall that America checks only required a single signature. It would have eased the burden, expedited the proceeding, and obviated the necessity of forgeries. Yet, it would be suggested that each of these significant considerations would be ignored because Jody [Musitano] and Janice, on a daily basis, could not remember how many signatures were involved with accounts they were administering. Yet, they would have the Court accept the fact that now, three years later, they are able to recall and remember this very fact which proved so imponderable at the time.

Plaintiff's Post-Trial Brief at 33–34.

In the final analysis, the court finds the testimony of the witnesses Moosally, Musitano and Voytilla unbelievable as simply not supported by logic and rational conclusions to be drawn from the totality of the evidence. Musitano and Voytilla gave a vivid demonstration of their easy facility for lying with their story concerning the ruse they devised to stave off the insistent creditor by telling him a second signature was unavailable, even though by then, all agree that one signature was sufficient.

### B.

■ Unfortunately for America, however, the inquiry cannot, in the court's view, rest with that conclusion, despite the overwhelming preponderance of trial time devoted to the question of the number of signatures required to create a valid check against the America account and the mechanics for ascertaining and relying upon that validity.

Rather, the overwhelming impression left by all of the testimony and other evidence is that, in essence, this melange of entities, including Lumara, Inc., Limited, JBC, Moosally along with his other corporations and America, all doing business in an admittedly chaotic and hectic fashion at the Market Street address were indeed, as characterized by the Bank at page 62 of its post-trial brief, "one large business enterprise." So perceived, and given the fact that virtually all of the transfers permitted by the Bank and now complained of by American never left the "family" (all checks complained of, except one, were written to Lumara, Inc., Limited, Rollerworld, JBC and Moosally, the sole exception being a $5,000.00 check to Home Savings & Loan Association which was ultimately dismissed, upon stipulation, as a party defendant), the Bank cannot justly be held accountable for the funds America claims it lost. A holding otherwise would necessarily involve a determination that America is an independent entity, distinct from the others under the Moosally umbrella of ownership. The facts are to the contrary.

A leading corporate law treatise, in discussing instances in which a separate corporate entity may be denied to exist, notes:

The common significant factors which would justify disregarding a corporate entity have been undercapitalization, failure to observe formalities, nonpayment of dividends, siphoning of corporate funds by dominant stockholders, nonfunctioning of other officers or directors, absence of corporate records, use of the corporation as a facade for the operations of the dominant stockholder, and use of the corporate entity in promoting injustice as fraud.

1 W. Fletcher, *Cyclopedia of the Law of Private Corporations,* § 41.30 at pp. 428–29 (1983). Fletcher's indicia of lack of separate existence quite accurately portray the manner in which the Lumara and Moosally entities operated. "Where one corporation is so organized and controlled and its affairs are conducted so that it is, in fact, a mere instrumentality or adjunct of the other, the fiction of the corporate entity of the 'instrumentality' may be disregarded." Fletcher, *supra,* § 43.10. Noting that fraud is a frequent, though not essential ground for application of the alter ego doctrine, the Sixth Circuit has held:

> The courts will disregard the corporate fiction when its retention would produce injustice or inequitable consequences.

*Bucyrus-Erie Co. vs. General Products Corp.,* 643 F.2d 413, 419 (1981).

With respect to America, an overriding theme emerging from all of the witnesses' testimony is that America was severely undercapitalized from its inception. It was only because of the seasonal high volume of sales that America was able to be in a relatively cash rich posture at the outset of its existence; thereafter, particularly when the expected recovery from the pending franchise fee litigation proved less than anticipated, the enterprise became a troubled one.

> It is coming to be recognized as the policy of the law that stockholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities. If the capital is illusory or trifling compared with the business to be done

and the risks of loss, this is ground for denying the separate entity privilege.

Fletcher, *supra,* § 44.1 (footnotes omitted): *see also, In re County Green Ltd. Partnership,* 438 F.Supp. 701 (W.D.Va.1977); *Remme v. Herzog,* 222 Cal.App.2d 863, 35 Cal.Rptr. 586 (1963).

Just as obvious as the financial weakness of America as the evidence unfolded was the interwoven relationship between Moosally, the Lumara entities and the other Moosally businesses. Repeatedly the witnesses described the intercompany transfers of funds, the practice of the entities kiting checks to cover overdrafts of the other entities, employees on the payroll of one entity performing duties for others and the general propensity of the officers to treat the various entities as an aggregate. Counsel for America has highlighted this unified relationship in demonstrating that Moosally procured a loan from the Bank on behalf of America to enable JBC to reduce its debt to the Bank. As shown earlier, that loan's proceeds began with America, were then transferred to Moosally, thence to JBC and finally to the Bank. Perhaps the ultimate example of the interrelationship of these entities is the fact that Moosally was at liberty to pledge all of the assets of Lumara, Inc. and his various other corporations to secure the purchase of the Treacher's chain from Mrs. Paul's. Clearly, these allegedly separate entities were treated as interchangeable parts, with each lacking virtually any degree of autonomy.

Moosally's unchallenged dominance over all of these enterprises is equally clear. As previously noted, DiNardo was almost entirely passive in terms of America's operations, so much so that those doing business with America were unaware that he was an officer. In effect, the other officers and directors of the Lumara entities defaulted in their responsibilities because they permitted Moosally to manipulate those organizations to serve primarily his own interests.

Repeatedly the evidence demonstrated that a primary goal of the various intercompany transfers was to insure that both

America and JBC would continue as viable entities. Moosally emphasized the fact that he was shuffling these funds in an effort to buy time in anticipation that Cataland would settle the franchisee litigation and thereby provide America with an injection of capital. Thus, when these intercompany transfers occurred, and when these funds left America it was quite likely that they would ultimately return for the benefit of America, or so Moosally would have us believe. In any event, the forgeries cannot be found to be the responsibility of Union Savings. A contrary holding would, in the court's opinion, result in the "injustice or inequitable consequences" of which the Sixth Circuit warned in *Bucyrus-Erie Co., supra.* The losses are more properly attributable to the under-capitalization of America, the propensity of Moosally to transfer funds from one entity to another, the dominance of Moosally over the other officers and shareholders and the interrelationship among the various entities which compels the court to conclude that they acted as "one large business enterprise" for the purposes of this case. Put another way, dealing as they primarily did with each other insofar as the checks under examination are concerned, one of these integral parts (America) of the whole cannot now look outside the "family" for recovery of funds that America's leadership allowed to disappear.

Having so concluded, the court must find in favor of the defendant Union Savings and order the complaint of the debtor and debtor in possession against it dismissed. An appropriate order will be entered forthwith.