62 F.3d 791
 Fed. Sec. L. Rep. P 98,843
William APPLETON, Trustee for the Liquidation of the
Business of First Ohio Securities Company,
Plaintiff-Appellant,
v.
FIRST NATIONAL BANK OF OHIO and Bank One, Akron, N.A.,
Defendants-Appellees.
 No. 93-4246.
 United States Court of Appeals,
Sixth Circuit.
 Argued March 20, 1995.
Decided Aug. 10, 1995.
Rehearing Denied Sept. 8 and Sept. 26, 1995.
 
 1
 Carl E. Cormany (briefed), Mark V. Webber (briefed), Bernard Goldfarb (argued), Goldfarb & Reznick, Cleveland, OH, for William Appleton.
 
 
 2
 Marc B. Merklin (argued), John W. Solomon (briefed), Brouse & McDowell, Akron, OH, for First Nat. Bank of Ohio.
 
 
 3
 Donald W. Davis, Ronald N. Towne (argued and briefed), Guy, Lammert & Towne, Akron, OH, for Bank One, Akron, N.A.
 
 
 4
 Theodore H. Focht (briefed), Michael E. Don, Josephine Wang, Securities Investor Protection Corp., Gen. Counsel, Washington, DC, for amicus curiae Securities Investor Protection Corp.
 
 
 5
 Before: MILBURN and NELSON, Circuit Judges; JOINER, District Judge.*
 
 
 6
 JOINER, District Judge.
 
 
 7
 This case arises out of a Ponzi scheme operated by Thomas Gilmartin, the sole shareholder of First Ohio Securities Corporation (FOSC), and FOSC's president, Terence Zawacki. Gilmartin and Zawacki diverted funds intended by their customers to be invested by FOSC, into a bank account maintained by Gilmartin's sole proprietorship, First Ohio Investment Corporation (First Ohio Investment). Plaintiff, William Appleton, is the trustee appointed to liquidate FOSC under the Securities Investor Protection Act (Act), 15 U.S.C. Secs. 78aaa-78lll. Defendants are two banks, First National Bank of Ohio and Bank One, Akron, N.A., at which First Ohio Investment maintained accounts into which funds designated for investment by FOSC were deposited.
 
 
 8
 The trustee seeks to recover the wrongfully diverted funds from the banks, and proceeds in two distinct capacities. First, standing in the shoes of FOSC, the payee on checks and wire transfers deposited into First Ohio Investment's accounts, the trustee asserts claims of conversion and negligence against the banks. First National's alleged liability on these claims is $6 million, and Bank One's alleged liability is $204,000. Second, proceeding on behalf of the Securities Investor Protection Corporation as the equitable subrogee of customers who delivered to FOSC checks made payable to third parties, the trustee claims that the banks must repay the amount of those checks because they too were wrongfully deposited into an First Ohio Investment account. First National's alleged liability here is $175,000, and Bank One's alleged liability is $1900.
 
 
 9
 The district court entered summary judgment against the trustee on both claims. The court held, first, that Gilmartin's operation of FOSC and First Ohio Investment as essentially one entity made the two entities alter egos, barring the trustee's claims which were asserted on FOSC's behalf; and, second, that there is no right of subrogation to the claims of customers against parties other than the estate of the investment firm which is in liquidation. The trustee appeals both determinations. We reverse.
 
 I.
 
 10
 As recounted by the Supreme Court, the history of the Securities Investor Protection Act dates back to the 1960s, when the securities industry experienced a business contraction that led to the failure or instability of numerous brokerage firms. Customers of these failed broker-dealers found their cash or securities on deposit dissipated or tied up in lengthy bankruptcy proceedings. Otherwise solvent broker-dealers that had open transactions with firms that had failed were threatened as well. "Congress enacted the [Securities Investor Protection Act] to arrest this process, restore investor confidence in the capital markets, and upgrade the financial responsibility requirements for registered brokers and dealers." Securities Investor Protection Corp. v. Barbour, 421 U.S. 412, 415, 95 S.Ct. 1733, 1736, 44 L.Ed.2d 263 (1975).
 
 
 11
 The Act created a new form of liquidation proceeding applicable to member firms, to ensure the completion of open transactions and the prompt return of customer property. Barbour, 421 U.S. at 416, 95 S.Ct. at 1736. In addition, the Act created the Securities Investor Protection Corporation (SIPC), a nonprofit membership corporation to which most registered broker-dealers are required to belong. 15 U.S.C. Sec. 78ccc(a). Finally, the Act required that the SIPC establish and maintain a "SIPC Fund" by levying assessments on its members. Sec. 78ddd. When necessary, the SIPC draws on this fund to satisfy the claims of the "customers" (as defined in the Act) of a bankrupt broker-dealer for cash or securities. The Act contemplates that customers' claims will be satisfied to the greatest extent possible from the assets of the bankrupt firm. The SIPC Fund supplements those assets, protecting customers' cash balances up to $100,000 and total cash and securities up to $500,000. Sec. 78fff-3; SIPC v. Ambassador Church Finance/Dev. Group, Inc., 788 F.2d 1208, 1209 (6th Cir.), cert. denied, 479 U.S. 850, 107 S.Ct. 177, 93 L.Ed.2d 113 (1986). In order to ensure the prompt payment of claims, the SIPC advances funds to the trustee for payment to customers. To the extent of its advances, the SIPC becomes subrogated to the claims of such customers. Sec. 78fff-3(a).
 
 II.
 
 12
 FOSC, a licensed securities broker and dealer, was incorporated in 1985. Gilmartin was the sole shareholder and had the title of chairman of the board. Zawacki was the president and chief financial officer. FOSC appeared to observe the customary corporate formalities: it adopted by-laws, elected directors, and maintained a corporate minute book. The company was audited annually by a certified public accounting firm, which addressed its report to the board of directors. The record indicates, however, that Gilmartin and Zawacki controlled FOSC, and that their observance of corporate formalities was less than meticulous.
 
 
 13
 FOSC's by-laws originally provided for only one director, Gilmartin. This restriction later was lifted and seven board members purportedly were elected, one of whom was Zawacki. Gilmartin testified in a related proceeding, however, that "[t]here were never really any true directors," and that they "never had a formal board meeting" for FOSC. This testimony is corroborated by that of the supposed board members themselves. One, John Smith, denied knowing he was a board member, although he attended a meeting pertaining to FOSC's management.[1] Two others testified that they knew they were board members, but only attended one meeting. The corporate minutes reflect that a number of board meetings were held between 1988 and 1990 at which Gilmartin, Zawacki and Smith were present; Smith denied having been present.
 
 
 14
 FOSC solicited customers for investment in certificates of deposit and the "All America Fund." Instead of making the promised investments through FOSC, Gilmartin diverted the would-be investors' money into First Ohio Investment bank accounts. Zawacki sent the customers fictitious statements in FOSC's name, and, when customers expected interest payments, Zawacki issued checks in FOSC's name but drawn from a First Ohio Investment account.
 
 
 15
 In November 1985, Gilmartin opened an account at First National in the name of First Ohio Investment, indicating that the account belonged to a partnership or a sole proprietorship, not a corporation. Between 1987 and June 1990, First National deposited $6 million in funds which were designated for payment to FOSC into the First Ohio Investment account. These deposits were made in two ways.
 
 
 16
 First National deposited a total of 165 checks made payable to FOSC, with a combined face value of approximately $3.1 million, into First Ohio Investment's account. Some of the checks so deposited bore no indorsement. Many were stamped with an indorsement which read, "First Ohio/For Deposit Only/50687886"; the account number given was for the First Ohio Investment account. Other forms of indorsement were used, including "For Deposit Only/First Ohio/50687886," "First Ohio/5068-7886" and simply "5068-7886." Only seven of the 165 checks so deposited bore an indorsement containing the words "First Ohio Securities." In addition, First National deposited into First Ohio Investment's account eleven other checks totalling approximately $275,000; these checks were made payable to persons other than FOSC, but delivered by would-be investors to FOSC for investment.
 
 
 17
 Wire transfers of funds intended for investment through FOSC were likewise deposited by First National into First Ohio Investment's account. Both FOSC and First Ohio Investment had executed wire transfer agreements, and these agreements reflected different addresses, account numbers and authorized persons. Customers directed wire transfers to First National with instructions to credit FOSC, but, apparently on Gilmartin's advice, included an account number that belonged to First Ohio Investment. A total of $2.9 million was transferred into First Ohio Investment's account in this fashion.
 
 
 18
 Gilmartin did not open a First Ohio Investment account with Bank One until April 1990, just two months before FOSC failed. FOSC did not have a Bank One account. When opening the Bank One account, Gilmartin indicated that First Ohio Investment was a corporation, but never supplied a corporate resolution approving the account. As he did with the First National account, Gilmartin caused checks made payable to FOSC and totalling $204,000 to be deposited into the Bank One First Ohio Investment account. Another check for $1900 was so deposited, but this one was made payable to a third party and delivered to FOSC for investment. Additionally, the parties state that Bank One deposited wire transfers naming FOSC into the First Ohio Investment account, but the amount of these transfers is not clear from the record.
 
 
 19
 The district court found, and the parties do not dispute, that Gilmartin used the First Ohio Investment account to defraud would-be investors with FOSC. It appears, however, that some of the funds wrongfully diverted made their way back to FOSC or its investors. An FOSC employee testified that Gilmartin told her that the First Ohio Investment account was the working capital account for FOSC, and, from the record presented, this characterization appears accurate. Gilmartin used funds from the First Ohio Investment account for FOSC salaries and business expenses; paid funds from the First Ohio Investment account to investors who believed they were liquidating their accounts or receiving interest payments; and in one instance, channelled funds from First Ohio Investment into his personal account, from which he then made a personal "loan" to FOSC to demonstrate to the National Association of Securities Dealers that FOSC was sufficiently capitalized to operate.
 
 
 20
 Due to the district court's disposition of the trustee's claims against the banks, the commercial reasonableness of the banks' practices was never decided. The banks agreed, however, that for the purposes of their summary judgment motions, the court should have assumed that they acted in a commercially un reasonable manner in depositing the checks and crediting the wire transfers at issue. Additionally, the trustee presented substantial evidence that the banks violated their internal policies and procedures in permitting the transactions at issue, by, e.g., not ensuring that the payee and indorser were the same parties, and not ensuring that the payee name and account number on wire transfers matched.
 
 
 21
 FOSC's license was suspended in June 1990, and liquidation proceedings were brought pursuant to the Act.[2] This case was commenced as an adversary proceeding in the liquidation, with FOSC's trustee seeking to recover from the banks the funds wrongfully diverted into First Ohio Investment's account. Standing in the shoes of FOSC, the trustee claimed that the banks were liable for statutory and common law conversion and negligence in paying the checks and wire transfers to First Ohio Investment rather than FOSC. Because the SIPC had paid the claims, up to the statutory limits, of would-be investors who had delivered checks made payable to third parties to FOSC for investment, the trustee asserted similar claims against the banks as equitable subrogee of these would-be investors. The district court granted the banks' motions for summary judgment on all of these claims.
 
 III.
 
 22
 The defendant banks moved for summary judgment with respect to their liability for depositing into First Ohio Investment accounts funds designated for FOSC, relying on three theories. First, the banks claimed that FOSC, through Gilmartin and Zawacki, authorized the indorsements and credit instructions which directed funds into the First Ohio Investment account, and therefore was estopped from contesting the banks' deposits. Second, the banks claimed that FOSC, again through Gilmartin and Zawacki, ratified the deposits at issue, and was estopped from contesting them. These two defenses were based on the premise that FOSC had a distinct identity, apart from that of its principals and First Ohio Investment. The banks departed from this premise with their third defense, which asserted that FOSC and First Ohio Investment were alter egos, and that the court should treat them as a single entity in assessing the merits of FOSC's contention that the banks converted its money by paying it into First Ohio Investment's account.
 
 
 23
 The district court did not address the authorization and ratification defenses directly, instead holding that the trustee's claims brought on behalf of FOSC were barred because Gilmartin operated FOSC and First Ohio Investment as alter egos, and that FOSC never suffered a monetary loss because the money never left the "Gilmartin organization." The court acknowledged that a corporation's alter ego status generally presents a question of fact, but held that no genuine issue of material fact existed on the record presented. Based on the factual premise that FOSC and First Ohio Investment were alter egos, the court held as a matter of law that FOSC was estopped from challenging the propriety of the deposits at issue. Finally, the court found it unnecessary to address whether the banks acted in a commercially reasonable manner or were negligent. According to the court, a good faith defense applies only after a bank is found to have converted funds. The alter ego doctrine prevented a finding of conversion because, with no distinction observed between FOSC and First Ohio Investment, all the funds in First Ohio Investment's account would be considered FOSC's property. Thus, the court employed the "piercing the corporate veil" doctrine as a defense to liability, rather than as a means of providing a remedy to avoid injury, the usual, but not the only, context in which the doctrine has been employed.[3] Accord In re Lumara Foods of America, 74 B.R. 95 (N.D.Ohio Bankr.1985), aff'd, 74 B.R. 104 (N.D.Ohio 1987).
 
 
 24
 The district court decided this case without the benefit of the Ohio Supreme Court's recent decision in Society National Bank v. Security Federal Savings and Loan, 71 Ohio St.3d 321, 643 N.E.2d 1090 (1994). The plaintiff in that case was the assignee of Microtek Systems' accounts receivables. John Vedrody was the president and controlling shareholder of both Microtek and another corporation, NovelTree Productions. Shortly before Microtek's assignment to the plaintiff, Microtek received a check made payable to its order. Vedrody indorsed the check "for deposit only," and signed his name. Vedrody presented the check to defendant Security Federal with a deposit slip which bore the number of the NovelTree account, and the check was so deposited. The plaintiff claimed that Security Federal was liable for paying the check inconsistently with the restrictive indorsement, violating Ohio's enactment of former Uniform Commercial Code Sec. 3-206, former Ohio Rev.Code Ann. Sec. 1303.27 (Anderson 1993).[4] The court held that a "depository bank ... presented with a check bearing a blank restrictive 'for deposit only' indorsement made by or on behalf of the payee acts inconsistently with the indorsement in cashing or crediting the amount of the check to any account other than one held in the name of the payee." Id., 643 N.E.2d at 1093. Security Federal thus converted the check "by acting in express contravention of the restrictive indorsement." Id. at 1094. In reaching its decision, the court rejected two arguments similar to those advanced by the banks in this case, i.e., that Security Federal acted lawfully because Vedrody was authorized to direct the proceeds into the NovelTree account; and that Microtek, in whose shoes the plaintiff stood, was estopped to complain about the deposit, because Vedrody achieved the result he intended when Security Federal deposited the check into NovelTree's account.
 
 
 25
 We reject this argument as we disagree with its underlying premise that Microtek itself would be estopped from asserting its claim in conversion. Cf. Cairo Coop. Exchange v. First Natl Bank of Cunningham (1980) 228 Kan. 613, 616, 620 P.2d 805, 808, modified and rehearing denied (1981), 229 Kan. 184, 624 P.2d 420 ("[D]efendant [a depository bank] cannot assert the defense of estoppel where it failed to act with ordinary care.") In addition, Security Federal misconstrues the identity of the owner of the check in this case. The parties have stipulated that John Vedrody indorsed the Microtek check with his signature under the words "For Deposit Only" as president of Microtek. His actions in presenting the check to Security Federal with a deposit slip directing a deposit into NovelTree's account was made on behalf of NovelTree, as is evident from the deposit slip itself, which specifies the depositor by name as NovelTree and includes the account numbers of an account held by that legal entity. To accept Security Federal's suggestion that Vedrody's act in preparing the NovelTree deposit slip was simultaneously an act made on behalf of Microtek would require us to merge the legal identity of two separate incorporated entities with the individual who serves as president, controlling shareholder, and authorized signator of both. Ohio law does not permit such a merger. The doctrine that a corporate legal entity is distinct from its individual shareholders should be disregarded only when justice cannot be served in any other way. We conclude in this case that equitable estoppel principles do not preclude [plaintiff] from asserting Microtek's conversion claim.
 
 
 26
 Id. at 1094-95 (citation omitted; footnote omitted; emphasis added). The court refused to speculate whether it would reach the same conclusion if successful prosecution of Microtek's claim were likely to accrue to Vedrody's individual benefit. "In such a case, a piercing of Microtek's corporate veil so as to preclude assertion of the conversion claim by Vedrody might well be justified." Id. at 1095 n. 4.
 
 
 27
 Several points emerge from this decision. First, by its citation to Cairo Cooperative Exchange, the Ohio Supreme Court has indicated that a depository bank may not assert an estoppel defense if it failed to act with ordinary care. Second, the bank must act consistently with the indorsement on an instrument, and it is immaterial that a corporate officer acted with authority in directing a bank to act inconsistently with the indorsement, or could have achieved the same result in another way. Finally, at least in the circumstance where the person seeking to recover from the bank is not the "wrongdoer" himself, the proper focus is on the corporation to which payment was ordered, and the law does not permit the court to merge the corporation with its owner/operator to defeat a cause of action against the bank.
 
 
 28
 The parallels between Society National and this case are obvious. The banks claim that their presumed failure to exercise ordinary care in making the deposits at issue is irrelevant because (1) Gilmartin and Zawacki acted with authority in instructing them to deposit FOSC's money into First Ohio Investment's accounts; and (2) in any event, the separate identities of FOSC and First Ohio Investment should be merged, with the result that FOSC lost nothing because its money was in its alter ego's accounts. Society National, however, holds that the alter ego defense is not available, and that the authorization defense is likewise unavailable if its recognition would require that the corporate payee's distinct identity be merged with that of another entity.[5]
 
 
 29
 In light of Society National, we reverse the district court's judgment in the banks' favor. We remand to permit the court to determine whether the banks acted inconsistently with the indorsements on the checks and the instructions on the wire deposits, and whether the banks acted with the requisite degree of care.
 
 IV.
 
 30
 The trustee's subrogation claim, brought on behalf of the SIPC, concerns 12 checks, totalling approximately $277,000, made payable to parties other than FOSC, but delivered to FOSC for investment. The circumstances underlying the checks are not altogether clear. In certain instances, customers apparently planned to invest in certain funds, and made the checks payable to those entities. In other instances, it appears that customers remitted checks to FOSC which were originally payable to themselves, but which they had endorsed for deposit to what they believed were their securities accounts at FOSC. Other checks were made payable to customers "c/o First Ohio Sec. Co." Each of the checks was delivered to FOSC prior to deposit in the account of First Ohio Investment. Each of the checks was the subject of a claim in the liquidation, and each was satisfied within the limits of the Act's protection. The resulting subrogation claim is for $177,000, because, in accordance with the statutory limits, the trustee paid only $100,000 to a claimant who delivered a $200,000 check to FOSC.[6]
 
 
 31
 The district court entered summary judgment against the trustee on the subrogation claim, giving rise to two issues on appeal: (1) whether the Act permits a subrogation action to be brought on behalf of customers against entities other than the estate of the broker-dealer; and, if so, (2) whether the investors who delivered the twelve checks at issue to FOSC were "customers" within the meaning of the Act.
 
 A.
 
 32
 The claim which a customer is entitled to have satisfied by the SIPC is his "net equity" claim: the dollar amount of the customer's account which would have been owed by the debtor if the debtor had liquidated the securities positions of the customer on the filing date, minus any indebtedness of the customer to the debtor. 15 U.S.C. Sec. 78lll(11). The SIPC is authorized to advance to the trustee the money required to pay such claims to the extent that they exceed the customer's ratable share of the customer property; when it does so, it obtains the subrogation rights set forth in Sec. 78fff-3(a):
 
 
 33
 To the extent moneys are advanced by SIPC to the trustee to pay or otherwise satisfy the claims of customers, in addition to all other rights it may have at law or in equity, SIPC shall be subrogated to the claims of such customers with the rights and priorities provided in this Act, except that SIPC as subrogee may assert no claim against customer property until after the allocation thereof to customers[.]
 
 
 34
 (Emphasis added.) The emphasized language was added to the statute in 1978.
 
 
 35
 In Redington v. Touche Ross Co., 592 F.2d 617 (2d Cir.1978), rev'd on other grounds, 442 U.S. 560, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979), the SIPC asserted a right to sue an accounting firm on behalf of customers of the insolvent broker, requiring the Second Circuit to address the accounting firm's arguments that the right of subrogation was limited to that against the debtor's estate, and that there was no common law right of subrogation. The Second Circuit disagreed with the latter contention. Relying on general principles of insurance law, the court noted that upon payment of a loss, an insurer is entitled to be subrogated to any right of action which the insured may have against a third party whose wrongful act caused the loss.
 
 
 36
 [W]e believe that it is more in keeping with the intent of Congress that wrongdoers not receive a windfall benefit from the existence of SIPC, and that SIPC be able to recoup its losses from solvent wrongdoers. Accordingly, we find that SIPC is subrogated to the right of action implied in section 17 in favor of brokers' customers against third parties such as accountants.
 
 
 37
 Id. at 624. Accord SEC v. Albert & Maguire Sec. Co., 560 F.2d 569, 574 (3d Cir.1977). Redington and Albert & Maguire were decided without reference to the 1978 addition to Sec. 78fff-3(a) of the language "in addition to all other rights it may have at law or in equity," a phrase which further supports the conclusions reached in those cases.
 
 
 38
 The principal authority against recognizing the trustee's equitable right of subrogation to the claims of customers against third parties is Mishkin v. Peat, Marwick, Mitchell & Co., 744 F.Supp. 531 (S.D.N.Y.1990), relied upon by the district court in this case. In Mishkin, the court concluded that the trustee had a statutory right to pursue claims of customers against the debtor's estate only, a point on which it found no disagreement from Redington. The court departed from the precedent of its circuit, however, in also dismissing the trustee's common law subrogation claim. Rejecting Redington 's analogy to insurance law, the court stated that the Act "is not an insurance statute and was not intended to be an insurance-type statute. Its roots are in section 60(e) of the old Bankruptcy Act." Id. at 557. The court further stated that a subrogation claim could not be based upon the amendment to Sec. 78fff-3(a), finding that the trustee's powers are limited by Sec. 78fff-1, which contains no reference to a right of subrogation.
 
 
 39
 We are not persuaded by Mishkin 's rejection of Redington 's analogy to insurance law based on the Act's roots in bankruptcy law. While a liquidation under the Act is similar to a bankruptcy liquidation, there is a key difference: a bankruptcy trustee has no trust fund to distribute to make creditors whole. Thus, bankruptcy law does not speak to the need, desirability, or authority for repaying that fund through subrogation actions such as the one at issue. Mishkin 's interpretation of Sec. 78fff-1 as a limiting provision is likewise misplaced. That provision details powers and duties of an SIPC trustee, but those powers expressly are supplemented by Sec. 78fff-3(a).
 
 
 40
 In sum, based on Redington and the 1978 amendment to Sec. 78fff-3(a), we are persuaded that a right of subrogation exists on behalf of customers whose claims have been paid by the SIPC against third parties such as the defendant banks in this case, and reverse the district court on this issue.[7]
 
 B.
 
 41
 As noted, those who are protected by the Act are "customers," defined as pertinent to this case to include those who have "deposited cash with the debtor for the purpose of purchasing securities."[8] 15 U.S.C. Sec. 78lll(2) (emphasis added). The banks contend that the would-be investors who delivered checks to FOSC did not have customer status, and that the trustee thus has no right of subrogation because he satisfied their claims as a mere volunteer. The banks argue that under state law, delivery of a check does not constitute an assignment of funds, and thus does not constitute cash. No "cash" was involved in the transaction until the checks were honored, and this occurred after they were deposited into First Ohio Investment 's account. FOSC received no cash, and its would-be investors do not have customer status. The SIPC was not obligated to satisfy these investors' claims because they were not "customers." Thus, under the banks' view, one who excavates his mattress to make an investment immediately gains "customer" status, while one who writes his broker a check does not.[9]
 
 
 42
 Assuming the accuracy of the banks' description of the effect, under state law,[10] of delivery of a check, we are not persuaded that state law is dispositive. We are concerned here with a definition employed in a federal statute, critical because it identifies those persons who are entitled to the protection of the statute. This is a question of federal law, which must be determined with reference to the language of the definition itself and what guidance we can discern from indications of legislative intent. See Murray v. McGraw (In re Bell & Beckwith ), 821 F.2d 333, 338 (6th Cir.1987).
 
 
 43
 In all cases of statutory construction, the starting point is the language employed by Congress. SEC v. Ambassador Church Finance/Dev. Group, Inc., 679 F.2d 608, 611 (6th Cir.1982) (citing American Tobacco Co. v. Patterson, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982)). Reliance on the literal language of the statute is not justified, however, if it leads to an interpretation which is inconsistent with the legislative intent or to an absurd result. Similarly, even when the language of a statute is clear, "ambiguity may exist if it appears that the legislature did not consider a particular problem which a court is called upon to resolve." Ambassador Church, 679 F.2d at 611 (citing Rose v. Lundy, 455 U.S. 509, 516-17, 102 S.Ct. 1198, 1202-03, 71 L.Ed.2d 379 (1982)). As the Second Circuit once stated, "Judge Learned Hand has vividly admonished us not to be caught in the trap of language which seems, literally, too broad or too narrow to accommodate the patent legislative purposes." SEC v. F.O. Baroff Co., 497 F.2d 280, 282 (2d Cir.1974) (citations omitted).
 
 
 44
 The word "cash" is not defined in the Act. Based upon the legislative history of the Act, however, we believe that the term, as used to characterize customers of broker-dealers, includes checks. The primary purpose of the Act was "to provide protection for investors if the broker-dealer with whom they are doing business encounters financial troubles." Ambassador Church, 679 F.2d at 612 (quoting H.R.Rep. No. 91-1613, 91st Cong., 2d Sess. (1970), reprinted in 1970 U.S.C.C.A.N. 5254, 5255). The critical aspect of the "customer" definition is the entrustment of cash or securities to the broker-dealer for the purposes of trading securities. Ambassador Church, 679 F.2d at 613. Such a would-be investor has a fiduciary relationship with the broker-dealer, and is entitled to the protection of the Act.
 
 
 45
 In our view, an investor need not deliver currency and coins to become a cash customer of the broker-dealer. Limiting the definition of customer in this fashion would undermine the purposes of the Act generally, and would be inconsistent with the realities of transactions in the securities market as well. The defendant banks do not dispute that investors frequently, if not usually, use checks, not currency and coins, to deliver funds to broker-dealers for investment. We refuse to interpret the word "cash" in a manner that would result in uneven treatment of the same types of investors, the result which would occur if we were to follow the banks' reasoning. Thus, we conclude that the investors who delivered the checks to FOSC had "customer" status under the Act, and reject the banks' claim that the SIPC paid these customers as a volunteer rather than under a legal duty imposed by the Act.
 
 
 46
 The banks' argument does not stop here, however. The banks contend that if we assume that FOSC received "cash" from its customers, the banks cannot be held to have converted these funds. This simply does not follow. We hold only that checks are one form of cash for purposes of determining whether an investor is a "customer" within the meaning of the Act. The banks stipulated that FOSC's customers delivered these checks to FOSC. The manner in which the checks were later indorsed, negotiated and deposited will determine whether the banks are liable.
 
 
 47
 REVERSED and REMANDED for proceedings consistent with this opinion.
 
 
 
 *
 The Honorable Charles W. Joiner, United States District Court for the Eastern District of Michigan, sitting by designation
 
 
 [1]
 This meeting, at which Gilmartin, Zawacki, Smith and three others were present, was held in November 1987. Smith did not understand this to be a directors' meeting, but others did. The participants agreed to remove Gilmartin as a signatory on FOSC's accounts based on a concern that Gilmartin was speculating with FOSC funds. Zawacki wrote to First National, where FOSC maintained an account, and asked the bank to remove Gilmartin from the account. Zawacki never supplied First National with the certified corporate resolution required by it to effect this change, and Gilmartin remained a signatory on FOSC's accounts until June 1990
 
 
 [2]
 Gilmartin and Zawacki subsequently pled guilty to a number of federal offenses
 
 
 [3]
 Compare Bucyrus-Erie Co. v. General Prods. Corp., 643 F.2d 413 (6th Cir.1981) (corporate veil pierced to find president and majority shareholder of corporation liable for corporation's conversion of sale proceeds) with Thrift Fed. Savs. & Loan Assoc. v. Overton, 56 Ohio St.3d 48, 563 N.E.2d 289 (1990) (owner/operator of corporate insured was its alter ego; corporate veil pierced to prevent corporation's insurance policy, which excluded coverage for loss due to dishonesty or fraud of insured, from covering criminal acts of owner/operator)
 
 
 [4]
 Articles 3 and 4 of the U.C.C. were revised in 1990, and Ohio adopted many of the proposals, effective August 19, 1994, after the events at issue in this case
 
 
 [5]
 We interpret Society National 's broad language and its rationale as applying as well to the defense of ratification, as that defense differs from authorization only with respect to the timing of the corporation's alleged approval of the acts in question
 
 
 [6]
 The trustee does not explain why he does not assert a subrogation claim on behalf of FOSC's other would-be investors, although SIPC funds were advanced to satisfy their claims
 
 
 [7]
 Redington further recognized the trustee's right to proceed on behalf of the debtor as bailee of its customer's property. Amicus SIPC in this case urges us to reverse on this basis as well. The trustee, however, did not allege bailment rights in his complaint. On remand, the trustee may move to amend his complaint and thus permit the district court to address this issue
 
 
 [8]
 Section 78lll(2) states:
 "The term 'customer' of a debtor means any person (including any person with whom the debtor deals as principal or agent) who has a claim on account of securities received, acquired, or held by the debtor in the ordinary course of its business as a broker or dealer from or for the securities accounts of such person for safekeeping, with a view to sale, to cover consummated sales, pursuant to purchases, as collateral security, or for purposes of effecting transfer. The term 'customer' includes any person who has a claim against the debtor arising out of sales or conversions or such securities, and any person who has deposited cash with the debtor for the purpose of purchasing securities[.]"
 
 
 [9]
 First National relies on Securities and Exchange Commission v. First Securities Co., 507 F.2d 417 (7th Cir.1974), where the would-be investor delivered property to a person other than the insolvent broker-dealer. First Securities has no bearing on this case, because the banks stipulated that the checks were delivered to FOSC before they were tendered for deposit to First Ohio Investment's account
 
 
 [10]
 See former Ohio Rev.Code Ann. Sec. 1303.45 (Anderson 1993); Barnhill v. Johnson, 503 U.S. 393, 112 S.Ct. 1386, 118 L.Ed.2d 39 (1992)