NOT RECOMMENDED FOR FULL-TEXT PUBLICATION

File Name: 17a0130n.06

CASE NO. 16-3395

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Feb 27, 2017
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| NIBCO INC., | ) | |
| | ) | |
| *Plaintiff-Appellant*, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| CITY of LEBANON, | ) | COURT FOR THE SOUTHERN |
| | ) | DISTRICT OF OHIO |
| *Defendant-Appellee*. | ) | |
| | ) | |

Before: SILER, BATCHELDER, and GRIFFIN, Circuit Judges.

**ALICE M. BATCHELDER, Circuit Judge.** Due to its employee's clerical error, a municipality mistakenly undercharged a customer for electricity over a period of 65 months and, upon realizing its mistake, demanded that the customer pay the full $1.27 million undercharge. The parties' relationship was governed not by an individualized contract, but by a municipal ordinance, which had no provision authorizing the municipality to recoup undercharges arising from its own clerical error. The district court declared the ordinance ambiguous, held that the customer's interpretation would lead to an "absurd result," and ordered the full payment. Because we find that the ordinance is not ambiguous under Ohio law and that the customer is correct that the municipality has no authority to recoup this undercharge, we REVERSE.

**I.**

As part of its municipal governance, the City of Lebanon, Ohio, provides electrical service to its community. When establishing a new account, a City employee inputs into the billing software certain customer information, such as the billing address, metering information,

and a "meter multiplier." This meter multiplier is based on the size of the electric service needed for a particular facility and directly affects the customer's monthly billing, but, according to the City, it is not something that most customers have ever been exposed to or understand.

Nibco is a manufacturing company headquartered in Indiana. Near the end of 2008, it moved a facility to a new address in Lebanon and submitted to the City an "Application for Utility Services," in which it agreed to "be responsible for payment of all bills lawfully due with respect to the above requested services [e.g., electricity] until notification to discontinue service." Importantly, Nibco (out of its corporate office in Indiana) paid every bill on time and in full.

When the City set up service for this new facility, it installed a new utility meter and established a new utility account. The meter functioned properly but a City employee had entered an incorrect meter multiplier into the billing software for the new Nibco account, inputting a value of 40 when it should have been 400. Because of this error, the City undercharged Nibco for its electricity from January 2009 until June 2014, for a total amount of $1,269,993. Neither party noticed the error until June 2014, whereupon the City re-set the multiplier to 400 for future billings and Nibco continued to pay all charges as billed.

The City then sent a letter to Nibco, stating its intent to recoup the undercharges by adding an additional $19,538.35 to each monthly bill for the next 65 months, but explaining that, "[s]ince the clerical error was the City's responsibility, and NIBCO did not notice the error, no interest or penalties shall be imposed on NIBCO." The City sent the first such bill, including the additional "undercharge recoupment amount" of $19,538.35, on December 30, 2014.

On January 29, 2015, Nibco sued, seeking a declaration that it had no obligation to pay the undercharged amount. Eventually, both parties moved for summary judgment.

The district court began with the agreed-upon premise that, because this is a municipally owned public utility, it is exempt from Ohio statutes governing public utilities and from

regulation by the Public Utilities Commission of Ohio (PUCO), and instead, the terms of service are governed solely by municipal ordinance. *Nibco Inc. v. City of Lebanon*, No. 1:15-cv-062, 2016 WL 1110315, *3 (S.D. Ohio, Mar. 22, 2016) (citing *Xenia v. Ohio*, 746 N.E.2d 666, 670 (Ohio 2000)). The parties also agree that the applicable ordinance—Chapter 910 of the City Code—did not address the question of whether the City could collect undercharges incurred for services provided but not billed due to the City's own clerical error. *Id.* The ordinance was "silent" on this issue.[1]

Nibco argued that the City had no basis for compelling this payment because Chapter 910 "did not provide a means by which the City [] could recoup undercharges caused by its own billing error." *Id.* The City answered "that the fact that Chapter 910 was silent on the issue of recoupment of undercharges" meant only that "no express language in Chapter 910 *prohibited* the City [] from collecting undercharges," *id.* at *4 (emphasis altered), and "that interpreting Chapter 910 to preclude it from collecting undercharges from customers for services actually consumed, but incorrectly billed due to a clerical error, would be an absurd result," *id.* Put another way, the issue is whether the City-as-public-utility has only the limited power that it (as a political government) has expressly given to itself via its ordinance (Nibco's view), or instead has unlimited inherent power but for that which it has expressly withheld it from itself via ordinance (City's view).[2]

Rather than address this question head on, the court declared that Chapter 910 was ambiguous, asserting that "ambiguity can exist in a statute with clear language if it appears that

---

[1] The City is emphatic about this silence, arguing that "[a] plain reading of the City of Lebanon's Code of Ordinances reveals that 'back-billing' or adjustments for inadvertent billing mistakes or clerical errors are simply not addressed. Aside from situations of meter malfunctions or meter tampering addressed in Section 910.04 where estimates of electric consumption are necessary, the Code of Ordinances is *silent* to any procedure or protocol for addressing and correcting billing mistakes or clerical errors." Ape. Br. at 10 (emphasis in original).

[2] The City's post-lawsuit enactment of a new provision, giving itself this power, indicates that even the City—at least in some measure—believes an ordinance is necessary to give it such power, rather than merely

the legislature did not consider a particular problem which a court is called upon to resolve." *Id*. (quoting *Appleton v. First Nat. Bank of Ohio*, 62 F.3d 791, 801 (6th Cir. 1995)). Note that the "legislature" here is the City itself, which promulgates its own ordinances. Nonetheless, the district court concluded that "courts can look beyond the language of a statute or ordinance when the text is ambiguous or when unambiguous language leads to an absurd result." *Id*.

From this, the district court held that because Chapter 910 "did not address recoupment of undercharges caused by a billing error," it could "look beyond the literal language of Chapter 910[,] given this particular ambiguity in the text, and conclude that the intent of the service contract is for the customer to pay all proper charges for electric services consumed." *Id.* (citation omitted). The court also added that "interpret[ing] Chapter 910 to prohibit the collection of undercharges … would lead to an absurd result," *id.*; that while "PUCO regulations do not govern the municipal utility services … they provide persuasive authority on industry practice [and] … authorize Ohio public utilities to collect undercharges caused by 'billing problems,'" *id*. at *5; and that if the City "does not collect the undercharges from NIBCO, then its other customers effectively will have paid a discriminatorily higher rate," which violates "the only restraint imposed by law upon a municipality's proprietary undertaking of providing electrical energy," *id*. (editorial marks omitted).

## II.

We review a summary judgment de novo. *Bible Believers v. Wayne Cty.*, 805 F.3d 228, 242 (6th Cir. 2015) (en banc). The "interpretation of a local ordinance is also subject to de novo review." *O'Neill v. Louisville/Jefferson Cty. Metro Gov't*, 662 F.3d 723, 728 (6th Cir. 2011).

Nibco argues that the district court erred by permitting the City to recoup undercharges arising from its own clerical error, even though the ordinance provides no authority or provision

___

limiting some undefined inherent power. *See Nibco*, 2016 WL 1110315 at *3 n.1 (quoting new § 910.05(D)(2):

for that recoupment. Chapter 910 authorizes the City to recoup undercharges in only two particular circumstances: meter malfunctions and theft of service by the customer.

> § 910.04 COMPUTING THE READING.
>
> Whenever the meter for any utility product or service of the city's is read, it shall be the duty of the Service Department to compare the reading so obtained with the next previous reading and to compute the proper charge to be billed to the consumer.
>
> Whenever a meter reading is not available and whenever any meter has for any reason ceased to register, or fails to register accurately within 3%, the Service Department shall estimate the amount of product used or service rendered, and such estimate shall be the basis for computing the bill for such period and the basis on which either a bill adjustment action or a refund action shall be determined. Any such bill adjustment action or refund shall be limited to the preceding 12-month period.
>
> If the meter readings are not indicative of the consumer's actual product or service usage due to unauthorized taking of service, the Director of Service shall estimate both the amount of product used or service rendered and the time period during which the unauthorized taking occurred and compute an appropriate bill adjustment for such entire period.

City Code § 910.04 (R.1-1) (paragraph breaks added). Nibco reads this to mean that the City, by its own unilateral ordinance, has established three tiers of recovery for differing errors:

(1) Full recovery for theft of service (customer at fault);

(2) Limited 12-month recovery for meter malfunction (neither party at fault); and

(3) No recovery for anything else (City at fault).

Under this structure, Nibco argues, the City did not empower itself to recover for its own mistakes that are unknown to the customer. Instead, it placed the burden on itself to prepare accurate utility bills, §§ 903-905 (R.1-1), and suffer the consequences for failing to do so.[3]

---

"undercharges may be billed and the customer shall pay the charges for the entire period of inaccurate billing").

[3] *See also* Apt. Br. at 24 ("Allowing the City to recover for its own errors thus leaves 'little incentive to establish reasonable procedures to guarantee that its meters are properly calibrated or that its bills are computed accurately.' *Brown v. Walton Elec. Membership Corp.*, 531 S.E.2d 712, 713 (Ga. 2000).").

Nibco argues that the "absurdity" would be to allow the City unlimited recovery for mistakes of its own fault when the ordinance specifically limits recovery to 12 months for no fault.[4]

The City, however, like the district court, sees this unwritten "third tier" differently, as instead meaning full, unlimited recovery for everything other than meter malfunction, including underbilling attributable to the City. The first of the City's three supporting arguments is somewhat circular: the ordinance is ambiguous based on these conflicting views (i.e., no recovery vs. full recovery) and therefore necessitates judicial re-writing (or just writing in the first instance, as it happens).

The City quotes *Appleton v. First National Bank of Ohio*, 62 F.3d at 801, for two legal propositions: (1) "Reliance on the literal language of the statute is not justified [] if it leads to an interpretation which is inconsistent with the legislative intent or to an absurd result"; and (2) "[E]ven when the language of a statute is clear, ambiguity may exist if it appears that the legislature did not consider a particular problem which a court is called upon to resolve" (quotation marks and citations omitted).[5] And, based on this, the City insists, repeatedly, that it certainly did not intend that its Code of Ordinances would prohibit it from collecting payment for service actually consumed by a customer but underbilled due to clerical error.[6]

In response to this argument, Nibco reminds us that Ohio law (not Sixth Circuit law) governs this case and points us to *Dunbar v. Ohio*, 992 N.E.2d 1111 (Ohio 2013), which says:

---

[4] This 12-month limit also undermines the City's discrimination argument, inasmuch as it sets up the same "discriminatory" scheme (i.e., other customers paying more than the nonpaying customer) for any undercharges that would be unrecoverable because they were more than 12 months old. This is simply not a discrimination case.

[5] The question in *Appleton* was whether the word "cash" in the statute meant only currency and coins or also meant personal check as a form of "cash" though the statute did not explicitly include checks. *Id.* at 801.

[6] In its brief (p. 15), the City also asserts that "a 'court should not follow the literal language where it could not have been the legislature's intent.' *In re App. of Wells*, 2015-Ohio-2606, ¶ 26 (Ohio Ct. App., 2015)," but the City actually cites a dissent (O'Toole, J., dissenting). Moreover, that dissent relies on two cases: *F.B.I. v. Abramson*, 456 U.S. 615 (1982), in which the Court actually insists that it is not ignoring the literal language but rather interpreting it more appropriately, *see id*. at 625 n.7; and *Ohio v. S.R.*, 589 N.E.2d 1319, 1323 (Ohio 1992), which actually contradicts the City's proposition, and states that "[i]n construing a statute, it is the duty of the court to give effect to the words used in a statute, not to insert words not used."

> [A]mbiguity in a statute exists only if *its language* is susceptible of more than one reasonable interpretation. Thus, inquiry into legislative intent, legislative history, public policy, the consequences of an interpretation, or any other factors identified in [O.]R.C. 1.49 is inappropriate absent an initial finding that the language of the statute is, itself, capable of bearing more than one meaning.

*Id*. at 1116 (emphasis in original; citations omitted). Ultimately, the *Dunbar* court concluded that even though the statute in question was silent on the particular problem before it, that silence did not render the statute ambiguous. *Id.* ("Although [O.]R.C. 2743.48 does not specifically address a vacated guilty plea, we do not agree that this makes the statute ambiguous.").

City ordinance § 910.04 has no ambiguous language and therefore is not ambiguous. *See id.* Accordingly, under Ohio law, inquiry into legislative intent or public policy is inappropriate.

The City's second argument is that an Ohio appellate court case, *City of Akron v. Rogers Industrial Products*, No. 18227, 1997 WL 665719 (Ohio Ct. App., Oct. 8, 1997), specifically allows municipal utilities to recover electric service undercharges. That case held that:

> the contract [between them], construed as a whole, indicated that the parties' intent was that [Rogers] would pay for all of the electricity it used, and that the City would bill [Rogers] for that usage. [Rogers]'s failure to pay the amount by which it had been underbilled by the City, despite the fact that the amount was not billed in the usual monthly format, constituted a breach of the contract.

*Id*. at *2. The *Rogers* facts, while similar to the present facts, differ significantly in that there was a negotiated contract between the parties on which the court relied. And while the *Rogers* reasoning is in line with the City's position, that opinion does not actually represent Ohio law.

Prior to May 2002, "[p]ursuant to [Ohio] S. Ct. R. Rep. Op. 2(G)(1), an unpublished opinion of the [Ohio] court of appeals shall not be considered controlling authority in the judicial district in which it was decided (or anywhere else for that matter)." *Ohio v. Parker*, 642 N.E.2d 66, 68 (Ohio Mun. Ct. 1994); *Stapleton v. Holstein*, 723 N.E.2d 164, 166 (Ohio Ct. App. 1998) ("Unreported opinions of appellate courts are persuasive authority only, even within the issuing court's jurisdiction."); *cf* Ohio S. Ct. R. Rep. Op 3.4 ("All opinions of the courts of appeals

7

issued after May 1, 2002 may be cited as legal authority and weighted as deemed appropriate by the courts without regard to whether the opinion was published or in what form it was published.").

Because *Rogers* is unpublished from 1997, it is not controlling law. Moreover, given that *Rogers* analyzed its circumstances by interpreting "the contract, construed as a whole," to find within that contract an "intent … that [Rogers] would pay for all of the electricity it used," and therefore a breach of that contract, the *Rogers* opinion is of little persuasive value inasmuch as we have no individualized or negotiated contract here, nor any action for "breach of contract." Instead, we have the City's unilaterally enacted ordinance, which offers only silence on this issue and gives rise to the equally plausible possibility that Nibco intended to pay for only the electricity for which it was actually, timely billed—which it did pay, every bill.

Finally, the City cites two Ohio cases for the proposition that public utilities must recover for mistaken underbillings because failure to do so would cause a discriminatory overbilling of the other customers: *Norman v. P.U.C.O.*, 406 N.E.2d 492 (Ohio 1980), and *Cincinnati Gas & Electric v. Joseph Chevrolet Co.*, 791 N.E.2d 1016 (Ohio Ct. App. 2003). In *Norman*, 406 N.E.2d at 494, the municipal utility (Cincinnati Gas & Electric, i.e., "CG&E") had "backbilled" several customers for periods of one to six years, in amounts from $65 to $1,741 each, and those customers (i.e., *Norman* plaintiffs) filed a complaint with the Public Utilities Commission of Ohio (PUCO) and appealed to the Ohio Supreme Court, arguing that CG&E's regulations limited its backbilling to a two-month period. *Id*. at 495-96. Relying on Ohio statutes, the court began:

> In … CG&E's [regulations] there is no specific provision regarding backbilling made necessary because of metering problems discovered by means other than random, periodic checks.…
>
> ….

8

> [But] [i]t is neither unlawful nor unreasonable for [PUCO] to interpret a utility's service regulations in light of the statutory scheme for regulating that utility.
>
> ....
>
> [And] [t]hese two [statutory] sections [O.R.C. 4905.32 & .33] require the service regulations, as approved by [PUCO], to be interpreted to allow backbilling.

*Id*. at 496-97.[7] However, "[b]ased on the finding that backbilling innocent parties beyond a one-year period would be unjust and unreasonable, [PUCO] ordered a one-year limitation on backbilling." *Id*. at 497. Specifically, PUCO "viewed payment for unbilled service beyond a year as being unfairly harsh to the customer who could not be expected to know, or who justifiably did not know, of the undercharge." *Id*. at 498. But the Ohio Supreme Court disagreed that such extensive backbilling would be "unfairly harsh"; instead, it would improperly "spread[] the cost of the unbilled service to all the utility's customers, rather than to the customers who actually used the service the utility provided." *Id.* Consequently, the court held that, "[i]n the absence of statutory authority, [PUCO] cannot limit a utility's practice of backbilling to one year," *id.,* and in so doing, also rejected the *Norman* appellants' claim of a two-month limit.

In *Joseph Chevrolet*, 791 N.E.2d at 1017, the public utility (again CG&E) backbilled Joseph Chevrolet for $79,549 of unbilled gas consumption over a 23-month period, arising from CG&E's own admitted mistakes. When CG&E sued to recover the underpayment and obtained a jury verdict, Joseph Chevrolet appealed, and the appellate court affirmed based on Ohio statute:

> Ohio's public-utility statutes clearly set forth a public policy that public utilities cannot discriminate among their customers. … [A] public utility cannot directly or indirectly collect less from customers in like circumstances, for like or substantially similar services. …
>
> Allowing a customer to pay less because of a malfunctioning meter results in the public utility's service not being supplied 'under a given rate structure' because

---

[7] The *Norman* dissent argued for the CG&E regulation that limited backbilling to two months even if that regulation "may be ambiguous," because "[w]e have held that where the meaning of a tariff is ambiguous, it is to be construed in favor of the consumer [whereas] [t]oday's decision construes the tariff in favor of the very entity that drafted and caused any ambiguity, rather than the consumer who suffers from this construction." *Norman*, 406 N.E.2d at 499 (Locher, J., dissenting) (*citing Saalfield Publ'g Co. v. P.U.C.O.*, 77 N.E.2d 914 (Ohio 1948)). Thus, the *Norman* court was aware of and implicitly rejected a construed-against-the-drafter argument.

the customer with the malfunctioning meter is paying less than a customer with a properly working meter for the same amount of gas.

*Id*. at 1022-23 (footnotes omitted) (citing O.R.C. 4509.32 and 4509.33). The court also cited and relied on *Norman*, 406 N.E.2d at 497, and rejected Joseph Chevrolet's defenses:

We sympathize with the situation of a business being 'sandbagged' by a large unforeseen bill. But to allow Joseph [Chevrolet] to assert equitable estoppel or laches would allow it to relieve itself of the obligation to pay for the gas it consumed, thus permitting it to pay less for the same service than other customers had paid during the same time. This would be in direct contravention of the public policy *embodied in the public-utility statutes*. …

This is one of those situations where absolute equity must give way to the greater overall good. *In adopting a comprehensive scheme of public utility rate regulation* the Legislature has found it impossible to do absolute justice under all circumstances. …

*Joseph Chevrolet*, 791 N.E.2d at 1024 (footnotes and quotation marks omitted; emphasis added).

The point of these two cases, the City argues, is that, based on public policy and the need to avoid discriminatory overbilling of the other customers, the Ohio courts would uphold its right to full recovery of mistaken underbillings. But Nibco responds that the obvious "fatal flaw" in this argument is that both cases rest on PUCO *statutes*—i.e., "a comprehensive scheme of public utility rate regulation," *id*.—which do not apply in this case because municipal utilities, such as the City, are specifically exempt from PUCO statutes, as both parties agreed and the district court expressly acknowledged. *Nibco*, 2016 WL 1110315 at *3. Therefore, *Norman* and *Joseph Chevrolet* do not control and, because the City ordinance has no provision corresponding to the PUCO provisions underlying those two cases, they are not persuasive either.

In the end, because the City's ordinance is "silent," the City has no authority to justify its backbilling here. As Nibco argues, "[t]he City's puzzling request to 'void' its own legislative 'silence' (City Br. 32) is, at bottom, a thinly-veiled plea that the federal judiciary rewrite its Code of Ordinances to provide a remedy that did not exist at the time of its errors." Apt. Reply Br. at 12. That we cannot do.

10

**III.**

For the foregoing reasons, we REVERSE the judgment of the district court and REMAND for entry of judgment in favor of Nibco.