CITY OF XENIA, Appellee,

v.

The STATE of Ohio, CENTRAL STATE UNIVERSITY, Appellant.

[Cite as *Xenia v. State* (2000), 140 Ohio App.3d 65.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

No. 00AP–3.

Decided Sept. 28, 2000.

· *Shuler, Plank, Morgan & Brahm* and *Gordon P. Shuler*, for appellee.

*Betty D. Montgomery*, Attorney General, and *Randall W. Knutti*, Assistant Attorney General, for appellant.

LAZARUS, Judge.

Defendant-appellant, Central State University ("CSU"), appeals from a judgment of the Ohio Court of Claims, awarding plaintiff-appellee, the city of Xenia, Ohio, $697,850.02.

Although CSU is not located in Xenia, Xenia provides CSU with water and sanitary sewer service. Xenia provides CSU with water pursuant to a written contract, which the parties first entered into on November 14, 1972. By it terms, the original water services contract expired on December 31, 1972, but has been automatically "extended" for successive one-year periods since that time. No written contract for sanitary sewer services exists between Xenia and CSU.

In April 1994, CSU failed to pay its water and sewer bills in full. Since that time, CSU has continually been in arrears on the principal portions of both its water and sewer bills, even though CSU has, on occasion, made payments in excess of the current charges for a given month. As of April 1999, CSU had unpaid principal balances of $52,937 on its water bill, and $26,492.51 on its sewer bill.

Since CSU first failed to pay the entire balances due on its water and sewer bills in April 1994, Xenia has added a monthly ten percent late payment fee to the outstanding principal balances on both accounts. As of April 1999, Xenia had charged monthly late payment fees totaling $402,962.15 to CSU's water account, and $215,433.36 to CSU's sewer account.

On June 25, 1997, CSU's Chief Financial Officer, Timothy I. Murphy, sent a letter to Xenia indicating that CSU would no longer pay the monthly ten percent late payment fees that Xenia had charged to its water and sewer accounts, but would continue to make payments toward its principal balances on both accounts.

On December 15, 1997, Xenia filed suit against CSU in the Ohio Court of Claims seeking to recover the unpaid principal balances and the monthly ten percent late payment fees that Xenia continued to charge to CSU's water and sewer accounts.

On May 14, 1999, this matter was tried to the Court of Claims. At trial, CSU did not contest Xenia's claim for the principal balances owed on the water and sewer accounts. Rather, CSU challenged Xenia's entitlement to the monthly ten percent late payment fees on various legal grounds.

On December 2, 1999, the Court of Claims issued a decision in which it concluded that CSU's legal arguments lacked merit and that Xenia was entitled to both the principal balances and the late payment fees that it had charged to CSU's water and sewer bills through April 1999. Accordingly, the Court of Claims entered judgment for Xenia in the amount of $697,850.02, which included the $50 filing fee paid by Xenia.

CSU appeals from the judgment of the Court of Claims raising the following assignments of error:

"First Assignment of Error

"The Court of Claims erred by failing to enforce the applicable two–year statute of limitations.

"Second Assignment of Error

"The Court of Claims erred by finding that Xenia's ordinance sets forth a 10% per–month late fee when it plainly sets forth a one–time 10% fee.

"Third Assignment of Error

"The Court of Claims erred by finding that the parties' 1972 water contract 'incorporated' a late–fee ordinance adopted more than 20 years later.

"Fourth Assignment of Error

"The Court of Claims erred by failing to apply the proper test for determining whether a contractual damages provision is enforceable as 'liquidated damages' or unenforceable as a 'penalty.'

"Fifth Assignment of Error

"The Court of Claims erred by finding that Xenia's late–fee ordinance is neither usurious nor unconscionable.

"Sixth Assignment of Error

"The Court of Claims erred by finding that Xenia has any constitutional entitlement to charge a 10% per–month late fee."

In the interest of organization, CSU's assignments of error will be addressed out of order.

■ CSU's sixth assignment of error asserts that the terms under which Xenia may sell water and sewer services to nonresidents of Xenia are to be found in the contract governing the sale and ordinary contract law principles, and not, as Xenia asserts, in the Ohio Constitution.

Throughout this litigation, Xenia has taken the position that it is empowered by Sections 4 and 6, Article XVIII, Ohio Constitution to impose whatever conditions it chooses upon nonresident purchasers of its water and sewer services, and that CSU therefore has no basis for challenging the imposition of the monthly ten percent late payment fee.

Section 4, Article XVIII, Ohio Constitution, provides as follows:

"Any municipality may * * * own * * * and operate * * * any public utility the products or service of which is or is to be supplied to the municipality or its inhabitants, *and may contract with others for any such product or service.*" (Emphasis added.)

Section 6, Article XVIII, Ohio Constitution, provides, in relevant part, as follows:

"Any municipality, owning or operating a public utility for the purpose of supplying the service or product thereof to the municipality or its inhabitants, *may also sell and deliver to others * * * the surplus product of any * * * utility * * *.*" (Emphasis added.)

■ Section 4, Article XVIII, Ohio Constitution empowers Ohio municipalities to own and operate public utilities, including water and sewer systems, for the purpose of providing utility services to themselves and their residents. See *Britt v. Columbus* (1974), 38 Ohio St.2d 1, 67 O.O.2d 1, 309 N.E.2d 412, paragraph two of the syllabus (holding that a sewer system is a public utility for purposes of Section 4, Article XVIII, Ohio Constitution); *State ex rel. McCann v. Defiance* (1958), 167 Ohio St. 313, 4 O.O.2d 369, 148 N.E.2d 221 (indicating that a water system is a public utility for purposes of Section 4, Article XVIII, Ohio Constitution). Together, Sections 4 and 6, Article XVIII, Ohio Constitution, authorize municipalities that own and operate public utilities to contract with entities outside their municipal borders for the sale of the public utility services. *Miller v. Orrville* (1934), 48 Ohio App. 87, 90–91, 1 O.O. 42, 43–44, 192 N.E. 474, 475–476.

■ Xenia is correct in asserting that Sections 4 and 6, Article XVIII, Ohio Constitution, generally exempt municipally owned public utilities from regulation by the General Assembly or the Public Utilities Commission of Ohio. *In re Complaint of Residents of Struthers* (1989), 45 Ohio St.3d 227, 543 N.E.2d 794, paragraphs one and three of the syllabus; *Columbus v. Pub. Util. Comm.* (1979), 58 Ohio St.2d 427, 12 O.O.3d 361, 390 N.E.2d 1201; *Toledo Edison Co. v. Bryan* (May 28, 1999), Williams App. No. WM–98–017, unreported, 1999 WL 334495. However, this rule has no application to the present case, as it does not involve a challenge to an attempt by the General Assembly or Public Utilities Commission to regulate Xenia's water or sewer systems.

■ Xenia also asserts that the terms of sale of municipally owned public utility services may only be judicially reviewed to determine that the rates being charged by the utility are reasonable and are not being applied in a discriminatory manner. In this assertion, Xenia is correct only with respect to sales of municipally owned public utility services to residents of the municipality which owns the public utility. *Fairway Manor, Inc. v. Summit Cty. Bd. of Commrs. Cty.* (1988), 36 Ohio St.3d 85, 87, 521 N.E.2d 818, 821, fn. 4. The terms under which the services of a municipally owned public utility are sold to residents of the municipality are established by municipal ordinance. Accordingly, municipal residents who are dissatisfied with the rates they must pay for the services of a public utility owned by their municipality have recourse through the democratic process. As a result, judicial review of the terms on which municipally owned public utility services are sold to municipal residents is virtually eliminated. However, because a municipality that owns a public utility has a duty to provide its own residents with the services of its public utility at a reasonable rate and without discrimination, courts will review the sale of municipally owned public utility services to municipal residents to ensure that the rates charged are reasonable and applied among residents in a nondiscriminatory manner. See *Fairway Manor* at 86–87, 521 N.E.2d at 820–821 (holding that a municipality has a duty not to discriminate in the provision of services of a municipally owned public utility, and by logical extension, suggesting that the same rule applies with respect to the charging of reasonable rates).

The present case, however, does not involve the sale of municipally owned public utility services to a municipal resident. Instead, the present case involves the sale of municipally owned public utility services to an entity residing outside the territorial limits of the municipality that owns the public utilities in question. In contrast to the terms of a sale of municipally owned public utility services to municipal residents, which are established by municipal ordinance, the terms of a sale of municipally owned public utility services to nonresidents are established by contract. *Fairway Manor* at 89, 521 N.E.2d at 822–823.

■ The scope of the judicial review of the terms of a sale of municipally owned public utility services to nonresidents is subject to review to ensure its compliance with the same statutory and common law rules that govern contracts generally. See *Perrysburg v. Koenig* (Dec. 8, 1995), Wood App. No. WD–95–011, unreported, 1995 WL 803592 (concluding that a municipally owned public utility may not impose whatever conditions it chooses upon the sale of its services to nonresidents, and that the terms of the contract governing the sale may not be unlawful). Accordingly, Xenia may collect the monthly ten percent late payment fees that it imposes on water and sewer accounts only if such fees are authorized by contract and are lawful.

The Court of Claims properly based its determination that CSU is obligated to pay the monthly ten percent late fees assessed to its water account upon its reading of the written water contract entered into by Xenia and CSU. Although the Court of Claims' reading of the water contract is challenged by CSU in its second, third, fourth, and fifth assignments of error, the water contract was the appropriate source in which to find the terms of Xenia's sale of water to CSU.

■ However, the Court of Claims' determination that CSU is obligated to pay the monthly ten percent late fees assessed to its sewer account lacks a proper legal foundation. The Court of Claims expressly found that there was no written contract regarding Xenia's provision of sewer services to CSU, and the court's decision contains no finding that the parties had an oral contract for sewer services. Moreover, the parties stipulated to the absence of any "formal contract" for sewer services. However, even if we read the Court of Claims' finding regarding the absence of a written contract as implying the existence of an oral contract, the record is devoid of any evidence which would support a finding that a monthly ten percent late payment fee was authorized by such an oral contract. Therefore, the Court of Claims' determination that CSU is obligated to pay the late fees charged to its sewer account must be reversed.

CSU's sixth assignment of error is sustained to the extent indicated above.

■ In its third assignment of error, CSU argues that the Court of Claims erred in determining that paragraph 11 of the water services contract had the effect of incorporating Xenia Municipal Code ("X.C.") 1040.04 into the contract.

The parties agree that at the time they entered into the water services contract in 1972, the contract did not authorize the imposition of any late payment fee. However, the trial court concluded that X.C. 1040.04(a)[1] authorizes the assess-

---

1. X.C. 1040.04(a) provides: "If an adjusting monthly bill based on a regular quarterly meter reading, or a monthly bill based on a regular monthly meter reading, for continued utilities services, is not paid in full by the due date specified on the bill, a five-day notice of shutoff

ment of a monthly ten percent late fee against the water accounts of Xenia's resident water customers, and that pursuant to paragraph 11 of the water contract, X.C. 1040.04(a) was incorporated into the water contract when enacted in July 1993.

Paragraph 11 of the water contract provides:

"That the rules and regulations of the Water Department of the City of Xenia, Ohio, and all applicable City Ordinances applying to the use or sale of water by the City shall be considered to be a part of this contract."

CSU argues that paragraph 11 was intended to incorporate into the water contract only those Xenia ordinances that were in effect when the contract became effective on November 14, 1972, and was not intended to incorporate ordinances, such as X.C. 1040.04, which were enacted after the effective date of the contract. Pointing to paragraphs 4 and 5 of the water services contract, CSU argues that, where the drafters of the contract intended to incorporate ordinances enacted after the contract's effective date, they made that intention clear. Paragraphs 4 and 5 provide as follows:

"4. That in the event water rates for the City of Xenia are *revised by ordinance* then the University shall pay for water at the revised rates with the surcharge of fifty per cent. (50%).

"5. That in the event rates for fire hydrants are *revised by ordinance* then the University shall pay for fire hydrants at the revised rates." (Emphasis added.)

The use of the phrase "revised by ordinance" in paragraphs 4 and 5 manifests an intention to prospectively incorporate ordinances related to water rates and fire hydrant rates, respectively. In contrast, paragraph 11 contains no such prospective language. Further, while the prospective language in paragraphs 4 and 5 incorporates relevant "revisions" to ordinances that existed on the water contract's original effective date, the prospective language in these provisions is not broad enough to incorporate an ordinance, such as X.C. 1040.04(a), which did not exist in any form on the water contract's original effective date. In any event, the language of paragraph 11 unambiguously indicates an intention to incorporate only presently existent water rules, regulations, and ordinances. Paragraph 11 simply cannot be read to incorporate rules, regulations, or ordinances that were not in existence when the contract became effective.

■ Xenia argues, however, that even if paragraph 11 did not incorporate X.C. 1040.04 into the original water contract, the provision was incorporated into

shall be mailed to the billing address on file in the Accounts Receivable Division and, effective September, 1992, an additional charge of ten percent of the unpaid charges shall be added thereto and become part of such unpaid charges."

subsequent extensions of the contract. Specifically, Xenia contends that each time the water contract was extended for a one-year period pursuant to paragraph 12, the parties entered into a new water contract. In turn, paragraph 11 of each new water contract incorporated all Xenia ordinances in existence on the new contract's effective date. As a result, X.C. 1040.04(a), enacted in July 1993, was first incorporated into the water contract when the contract was extended on January 4, 1994.

In *State ex rel. Preston v. Ferguson* (1960), 170 Ohio St. 450, 11 O.O.2d 204, 166 N.E.2d 365, the Supreme Court drew a distinction between contracts containing an option to renew, and those containing an option to extend. *Id.* at 457, 11 O.O.2d at 207–208, 166 N.E.2d at 371. Specifically, the court stated:

"* * * A contract containing an option to renew has the effect of granting a right to execute a new contract upon exercise of the option and the new contract is operative immediately after the terminal date of the original agreement. In other words, a contract containing a renewal option constitutes a present grant only for the original term, and a new contract must be executed at the end of such term if the option to renew is to be exercised. *On the other hand, a contract * * * containing an option to extend an agreement constitutes a present grant which, upon exercise of the option, operates to extend the term of the original agreement and the contract then becomes one for both the original and the extended term.*" (Emphasis added.) *Id.* at 457–458, 11 O.O.2d at 208, 166 N.E.2d at 371.

Paragraph 12 of the water services contract provides:

"That this contract shall continue in full force and effect until December 31, 1972, and be *extended* automatically for one (1) year periods thereafter unless either party gives the other a written notice expressing the intent to terminate said contract at least twelve months in advance of the date of termination." (Emphasis added.)

Paragraph 12 set forth an option to extend, rather than an option to renew, the water contract. Therefore, under *Ferguson*, no new water contracts ever came into being, but the original water contract remained continuously in force through a series of successive one-year extensions. *Ferguson*; cf. *Estate of Kinsey v. Janes* (1992), 82 Ohio App.3d 822, 827, 613 N.E.2d 686, 689–690 (relying on *Ferguson* to hold that a contract containing an option to renew resulted in a series of new contracts).

Because the original water contract remained in force at all times, only those Xenia ordinances that were in existence on the contract's original effective date have ever been incorporated into the contract. X.C. 1040.04 was not enacted until well after the water contract's original effective date. Accordingly, X.C.

1040.04 never became part of the water contract. Absent the incorporation of X.C. 1040.04 into the water contract, Xenia lacks any authority to assess late payment fees to CSU's water account.

CSU's third assignment of error is sustained.

Given our determination that there is no proper legal basis for Xenia's assessment of a late payment fee to CSU's sewer account, and our determination that the written water contract between Xenia and CSU does not authorize the assessment of a late payment fee to CSU's water account, CSU's first, second, fourth, and fifth assignments of error (which argue respectively that Xenia's collection of late payment fees imposed prior to December 14, 1995, is violative of the statute of limitations; that the late payment fee authorized by X.C. 1040.04 is a one time, rather than monthly fee; that the imposition of a monthly ten percent late fee constitutes an unlawful penalty; and that the imposition of a monthly ten percent late fee is usurious) are rendered moot. Accordingly, we decline to address CSU's first, second, fourth, and fifth assignments of error. App.R. 12(A)(1)(c).

Having sustained CSU's third and sixth assignments of error, and having determined CSU's remaining assignments of error to be moot, the judgment of the Ohio Court of Claims is reversed and this matter is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded*
*for further proceedings.*

KENNEDY, J., concurs.

PETREE, J., dissents.

CHARLES R. PETREE, Judge, dissenting.

Being unable to concur with the majority herein, I respectfully dissent. The trial court rendered what I believe to be a legally correct decision filed December 2, 1999, and I would not disturb Judge Bettis's result. Therefore, I find no need to restate herein the reasoning upon which I rely to affirm.