DECISION AND JUDGMENT ENTRY
{¶ 1} This is an appeal from the judgment of the Wood County Court of Common Pleas wherein the trial court granted summary judgment on behalf of appellees, the city of Perrysburg ("city"), Mayor Jody G. Holbrook, and Douglas Guest, and denied the motions for summary judgment filed by appellants, Gregory and Karen Bakies, Richard Smith, and certain commercial properties, (hereinafter collectively referred to as the "GEM appellants").[1] For the reasons that follow we affirm, in part, and reverse, in part, the decision of the trial court.
 {¶ 2} This court notes at the outset that in reviewing a motion for summary judgment, we must apply the same standard as the trial court. Lorain Natl. Bank v. Saratoga Apts. (1989),61 Ohio App.3d 127, 129. Summary judgment will be granted when there remains no genuine issue of material fact and, when construing the evidence most strongly in favor of the non-moving party, reasonable minds can only conclude that the moving party is entitled to judgment as a matter of law. Civ.R. 56(C).
 ASSIGNMENTS OF ERROR A. The Bakies' and Smith's Assignments of Error
 {¶ 3} The Bakies and Smith raise the following assignments of error on appeal:
 {¶ 4} "I. The trial court erred when it granted the appellees' motion for summary judgment and denied the appellant's motion for summary judgment.
 {¶ 5} "II. The trial court erred when it held that the appellants can be required to sign the annexation petition or risk discontinuation of the water services provided by the city.
 {¶ 6} "III. The trial court erred when it held the water service agreement executed by the Bakies was a valid, enforceable contract."
 The GEM Appellants' Assignments of Error {¶ 7} The GEM appellants raise the following assignments of error on appeal:
 {¶ 8} "I. The trial court erred by approving the City's unilateral attempt to force annexation of the plaintiffs-appellants' (hereinafter referred to as the `GEM plaintiffs') properties by conditioning the continued provision of vital sewer and water services (the `services') to the GEM plaintiffs on the GEM plaintiffs agreement to annex into the City.
 {¶ 9} "II. Even if the defendant-appellees (hereafter referred to as the `City' or `Perrysburg') are entitled to condition the continued provision of services on an agreement to annex, the trial court erred in ordering the GEM plaintiffs to sign annexation petitions rather than giving the GEM plaintiffs the choice of having their services shut off or signing annexation petitions."
 The City's Cross-Assignments of Error {¶ 10} The city of Perrysburg raises the following assignments of error in its cross-appeal:
 {¶ 11} "1. The trial court lacked jurisdiction to modify its Judgment Entry and Order after Bakies and Smith had filed their Notice of Appeal.
 {¶ 12} "2. The trial court erred and violated the law of the case doctrine when it substantively modified its Judgment Entry and Order after the appellate court had issued its injunction pending appeal.
 {¶ 13} "3. The trial court erred when it substantively modified its Judgment Entry and Order in a manner which was inconsistent with the injunction previously issued by the appellate court.
 {¶ 14} "4. The trial court erred when it enjoined the City of Perrysburg from pursuing enforcement of its ordinances, rules and agreements with respect to persons who were not parties to the action before it."
 STATEMENT OF THE CASE {¶ 15} Appellants own property within Perrysburg Township, but outside the city's territorial boundaries, and receive water and/or sewer services from the city, making them extraterritorial users. In June and July 2002, the city requested each appellant to sign annexation petitions, in accordance with city ordinances and/or agreements that had been signed by the property owners. Appellants were notified that noncompliance would result in termination of their water/sewer services.
 {¶ 16} Appellants filed suit against the city in August and September 2002, seeking to prevent the city from forcing them to sign annexation petitions in exchange for continued water/sewer services. The city counterclaimed, requesting the trial court to declare that the city's ordinances and the agreements the city had with certain appellants were valid and enforceable contracts, and to order that appellants were required to sign the annexation petition. The trial court consolidated the actions, granted the city judgment, held that the city's ordinances were enforceable, that the agreements signed by the Bakies and select GEM appellants were valid and enforceable contracts, and ordered appellants to sign the annexation petitions and otherwise exert all efforts to pursue annexation of their property to the city. The combined appeal is now before this court.
 STATEMENT OF FACTS
A. The Bakies and Smith
 {¶ 17} In 1975, Cavalear Development Company ("Cavalear") contracted with Wood County to have a water main extended to Willowbend Subdivision ("Willowbend"), which Cavalear was developing. Cavalear paid for the water main extension and was entitled to be reimbursed for tapping fees charged by the city; however, upon completion of the work, the contract stated that the water main became the property of the county. The contract was silent regarding water supply to the land owners and did not mention annexation.
 {¶ 18} The Bakies purchased their property in Willowbend in 1998. The city had extended water service to their home in 1979 when it was built. Insofar as the Bakies' property was located beyond the corporate limits of the city, and consistent with existing city ordinances, in order to obtain water service from the city, the Bakies signed an "Agreement for Water Service" on November 6, 1998. The water service agreement stated that "applicant shall exert all efforts to obtain annexation of his property to the City of Perrysburg" and "applicant shall raise no objections to the annexation and will cooperate in any and all respects including signing the annexation petition." Failure to comply with the agreement could result in the water service to the property being terminated upon ten days written notice. The Bakies refused to comply with this annexation agreement in 2002.
 {¶ 19} Smith purchased his home in Willowbend in 1978. At the time Smith began receiving water, he was not required to sign an agreement regarding annexation to obtain service. Smith has been paying the city for his water services continuously since 1978. In 2002, the city sought to require Smith to agree to annexation of his property, pursuant to the city's ordinances, in order to continue receiving services. Smith refused.
 GEM Appellants {¶ 20} The GEM appellants each began receiving water and sewer services from the city between 1972 and 1987. Three of the businesses signed a "Service Application and Contract" to obtain water/sewer services. The agreement stated, in pertinent part: "I/We agree to comply with all rules and regulations of the Divisions of Water and Water Pollution Control and other Service-related regulations as adopted by the City of Perrysburg." The businesses who signed these contracts were: Agri-Electronics Systems, Inc. ("Agri-Electronics"), in 1984; Corporate Intelligence Consultants, Inc. ("Corporate Intelligence"), in 1984; and GEM Properties, Inc. ("GEM"), in 1985. Each of the GEM appellants refused to agree to the city's 2002 request that they sign an annexation petition.
 Water and Sewer Agreements {¶ 21} There are a number of water and sewer contracts between the city and other governmental entities which are relevant to this litigation. Beginning in March 1952, the city contracted with the city of Toledo ("Toledo") to purchase water from Toledo for a period of 40 years. The 1952 contract provided that the city had "the right to sell the * * * water * * * to consumers within or without the corporate limits * * * so long as said sales, within or without the said corporate limits, do not exceed an annual daily average use of water in the amount of 800,000 gallons." In March 1961, the 1952 agreement was amended to identify a specific geographic area wherein the city had "the right to resell water furnished by Toledo", rather than a mere gallons per day limitation.
 {¶ 22} In 1973, the city contracted with Wood County ("county") for "the furnishing of water" to certain unincorporated areas of the county until December 31, 1980. The contract specified that "the City Superintendent of Water may enforce in the designated areas any and all rules and regulations now or hereafter lawfully in effect in the City to the extent that the same shall be applicable; provided, however, that such rules shall be of uniform application to users whether within or without the corporate limits of the City."
 {¶ 23} In 1977, the city also contracted with Wood County to collect and treat sewage generated in certain unincorporated areas of the county until December 31, 1982. This agreement also stated that "[t]he Water Pollution Control Superintendent of the CITY may enforce, in the District, rules and regulations, now or hereafter lawfully in effect in the CITY; provided, however, that such rules and regulations so enforced are uniformly applied to users resident within the CITY of Perrysburg."
 {¶ 24} In December 1984, the city again contracted with the county to furnish water and sewage treatment to certain unincorporated areas of the county until December 31, 1987. The agreements for water and sewer stated that the city's standards, ordinances, rules and regulations concerning water use and sewers "now existing or as promulgated or modified in the future will be enforced by the city." The agreements further stated that water and sewer services provided to users in the county "shall at all times be subject to all of the resolutions, ordinances and general rules and regulations of the county and the city." Users found to be in violation of county or city resolutions, ordinances or rules and regulations were subject to "all penalties provided therein," including suspension of water and sewer services.
 {¶ 25} In December 1987, the city again contracted with Toledo for the purchase of water for a period of 40 years. The 1987 agreement with Toledo superseded the 1952 agreement. The agreement states that there is "a continuing need for a water supply to adequately furnish same to existing and future consumers in the Perrysburg Water District." The agreement also states that its purpose "is to establish the terms and conditions under which Toledo will sell and deliver water to Perrysburg * * * for use in the Perrysburg Water District during the contract period and receive compensation for said water so supplied."
 {¶ 26} The 1987 agreement further states that the city agrees to operate and maintain "the entire water system in the Perrysburg Water District." In exchange, Toledo agrees "to supply to Perrysburg and all users now or hereafter connected within the Perrysburg Water District all water required by them * * *," subject only to the needs of consumers within Toledo. The agreement grants the city "the right to sell" the water it purchases from Toledo, but places certain limitations on where the water can be resold:
 {¶ 27} "SECTION 12. WATER TO BE USED ONLY IN PERRYSBURG WATER DISTRICT. Perrysburg shall have the right to sell the said water herein agreed to be purchased by it solely to consumers within the Perrysburg Water District."
 {¶ 28} In March 2001, the city contracted with Perrysburg Township ("township"), for a period of 99 years, regarding water and sanitary sewer services and annexation. The agreement specified which areas of the township would be serviced by which party, and each party agreed not to service the other's areas. The agreement further stated that the township "recognizes and agrees that the city shall be the sole supplier of sanitary sewer treatment services within the Sanitary Sewer service area." The areas the city was permitted to attempt to annex were also limited by the agreement.
 {¶ 29} In April 2001, in an Areawide Water Quality Management Plan ("Plan 208"), the Toledo Metropolitan Council of Governments changed the city's Facility Planning Area, wherein the city was expected to provide sanitary sewage treatment service. This change created conflicts with the city's March 2001 agreement with the township. As such, in August 2001, the city contracted with the Northwestern Regional Water and Sewer District ("NW Sewer District") to resolve the disputes. This subsequent 2001 agreement provided that all sanitary sewage generated in the service area shall be treated at the city's wastewater treatment plant, and that the city shall be "the exclusive provider of sanitary sewer treatment services to any and all users located partially or fully within the Service Area," and certain other unincorporated areas, effective until December 31, 2021.
 {¶ 30} The city, however, reserved in the August 2001 contract that "[n]othing herein shall or may be construed, interpreted, or applied so as to limit, restrict or otherwise alter Perrysburg's rights to lawfully annex any area or real property currently located outside of the City's boundaries, whether by agreement or legal process, subject to the City's agreements with Perrysburg Township and Middleton Township." The agreement further stated that "[a]ll users within the Service Area may be required to execute such contracts and/or permits as are required by the City and/or the District and which are not inconsistent with this Agreement."
 Perrysburg's Annexation Policy, Rules, Ordinances and Resolutions {¶ 31} There are also a number of city ordinances, rules and resolutions which are relevant to this litigation. Beginning on May 4, 1982, the city adopted Ordinance No. 33-82, which set forth the rules governing the division of water at section 1060.06(a) and (b) of the Codified Ordinances of the City of Perrysburg (hereafter referred to as "P.C.O."). In particular, P.C.O. 1060.06(b), Rule 1, states:
 {¶ 32} "This subsection shall be considered a part of the contract with every person, that is supplied with water through the water works system of the City, and every such person taking water shall be considered to have expressed his or her consent to be governed thereby."
 {¶ 33} In 1983, the city passed an ordinance "to clearly set forth its policy" concerning the extension of water service to areas outside the corporation limits. Ordinance No. 92-83 amended P.C.O. 1060.06(b) by adding Rules 61-64, which provided, in pertinent part, that except for users as of November 1983, no water service would be extended to water users outside the city limits unless owners of land contiguous to the city petitioned for annexation of such land to the city, and unless owners of land which, at the time, was not contiguous with the corporate boundaries, entered into an agreement with the city to exert all efforts to obtain annexation, including signing an annexation petition, when it was legally permissible to do so. Owners of noncontiguous land also had to agree to place a covenant in the deed requiring subsequent purchasers to exert all efforts to annex the land to the city, when permitted. These same rules were adopted by the city in 1985 with respect to sanitary sewer services. Ordinance No. 15-85, amending P.C.O. 1060.06(c), Rules 33-36.[2]
 {¶ 34} In 1988, the city adopted a policy on annexation. Resolution 15-88. Given the considerable population density in areas surrounding the city, the city council determined that "an overall annexation policy should be developed as a means of implementing the City's Comprehensive Plan and assuring orderly development." This decision was based on "long-established principles of land use planning dating back as far as the 1787 adoption of the Northwest Ordinance [which recognized] that the township form of government is appropriate for areas of low population density, while areas experiencing population growth which reach certain density levels should be governed by the city or village form of government."
 {¶ 35} In 1990, Ordinance Nos. 112-90 and 113-90 amended P.C.O. 1040.07(c), Rule 34, and P.C.O. 1060.06(b), Rule 62, to impose five requirements on owners of land situated outside the corporate limits who sought an extension of city sewer and water services to their property. Among them was the requirement that the property owners execute an agreement to exert all efforts to obtain annexation of the property, including the signing of an annexation petition, when it was legally permissible to do so.
 {¶ 36} In 1991, with respect to both sewer and water services, the city amended P.C.O. 1040.07(c), Rule 33, and P.C.O. 1060.06(b), Rule 61, to state that "any person making a new application for such service to a property to which service has been previously extended outside the corporate boundaries of the City" shall execute an agreement to annex the property and exert all efforts to obtain annexation of his or her property, including the signing of an annexation petition, when it is legally permissible to do so, and require a similar agreement from subsequent owners of the property. See Ordinance Nos. 18-91 and 19-91.
 {¶ 37} In 1998, pursuant to Ordinance Nos. 150-98 and 151-98, the city again amended P.C.O. 1040.07(c), Rule 33, and P.C.O. 1060.06(b), Rule 61. These amendments state that in order to continue receiving sewer and water services, when notified, "any person presently receiving" sewer or water services is required to comply with the provisions of Rules 34(e) and 62(e), which require owners to execute an agreement to annex their property to the city, sign a petition for annexation, and require a similar agreement from subsequent owners.[3]
 ANALYSIS A. The Bakies, Smith and GEM Appellants' Appeal
 {¶ 38} The city's power to acquire, construct, own, and operate a public utility within or without its corporate limits has been conferred upon it by Sections 4 and 6, Article XVIII, of the Ohio Constitution. Absent a contractual obligation, however, a municipally owned public utility has no duty to sell its products, including water and sewer services, to users outside its corporate limits. Fairway Manor, Inc. v. Bd. of Commrs. ofSummit Cty. (1988), 36 Ohio St. 3d 85, paragraph one of the syllabus. Rather, "* * * [i]n the absence of contract, the municipality, in selling and delivering any surplus product to others than the inhabitants thereof, does not become such a public utility as to be bound to serve indiscriminately all who may demand such service, but the municipality may sell and dispose of its surplus products in such quantities and in such manner as the council thereof determines to be in the best interest of the municipality and its inhabitants." State, exrel. Indian Hill Acres, Inc. v. Kellogg (1948),149 Ohio St. 461, paragraph three of the syllabus. Accordingly, absent a contract obligating a city to provide its services, a municipality has the authority to impose conditions on the sale of its utility services to extraterritorial users and, consequently, has the authority to refuse to sell its services to extraterritorial users who do not agree to the conditions demanded by the municipality. See Id.; and City of Perrysburg v.Koenig (Dec. 8, 1995), 6th Dist. No. WD-95-011.
 {¶ 39} Once a municipality has contractually obligated itself to supply water or sewer services to the public, however, it is bound to do so without discrimination. Indian Hill Acres,
supra, paragraph three of the syllabus, and Western ReserveSteel Co. v. Cuyahoga Heights (1928), 118 Ohio St. 544, paragraph one of the syllabus. In particular, Western Reserve
noted that "when a municipality, under the authority conferred upon it by the Constitution, engages in the operation of a public utility, it enters that field burdened with the same duties and subject to the same restrictions, in respect to the public of the territory served, as would apply to and govern a private corporation similarly engaged; and especially where it engages in such enterprise extra territorium is its relationship to the public shorn of sovereign prerogative." Western Reserve at 549-550. Nevertheless, where a contract provides no termination date, either party to the agreement may terminate it upon reasonable notice. Fairway Manor, supra at 89, citingGrandview Heights v. Columbus (1963), 174 Ohio St. 473, paragraph two of the syllabus. Hence, "a municipality does not assume a duty to continue supplying water in perpetuity to extraterritorial customers merely by virtue of having once agreed to supply it." Fairway Manor at 89.
 {¶ 40} With respect to ordinances requiring annexation agreements in exchange for water and sewer services, this court has held that a municipality can require property owners outside the corporate limits to enter into agreements regarding annexation of their property. See Andres v. City of Perrysburg
(1998), 47 Ohio App.3d 51; Village of North Baltimore v.McCarty (May 26, 2000), 6th Dist. No. WD-99-064; and City ofPerrysburg v. Koenig (Dec. 8, 1995), 6th Dist. No. WD-95-011. We have held that such a requirement with respect to extraterritorial users is a valid exercise of a municipality's police power. Andres, 47 Ohio App.3d at 53, citing Indian HillAcres, supra; Shipman v. Lorain Cty. Bd. of Health (1979),64 Ohio App.2d 228; and Stow v. Cuyahoga Falls (1982),7 Ohio App.3d 108.
 {¶ 41} In Koenig and Andres, this court upheld Perrysburg's Ordinance Nos. 92-83 and 15-85, which required property owners to sign annexation agreements in order to have water and/or sewer services extended to their properties. In both cases, the property owners sought services between December 31, 1984, and December 31, 1987, during a time when the city had contracted with the county to provide water and sewer services to portions of the county. Although under a contractual duty to provide water and sewer services pursuant to the 1984-1987 agreement, the city conditioned its obligation to supply services by requiring that users in the county "shall at all times be subject to all of the resolutions, ordinances and general rules and regulations of the county and the city." Because the city's duty to provide services was conditioned on the users being subjected to the city ordinances, we held that the city was entitled to require an annexation agreement in exchange for the extension of services to the property owners covered by the 1984 water and sewer agreements.
 {¶ 42} We have also held, however, that annexation covenants were unenforceable as a matter of law when, at the time the municipality required annexation covenants in exchange for sewer services, the municipality already had an unconditional contractual duty to provide sewer services to property owners outside the city limits. Sylvania v. Ralston, 6th Dist. No. L-01-1448, 2002-Ohio-3575. In Ralston, the city of Sylvania had contracted with Lucas County in 1973 regarding sewer services. The contract stated that Sylvania "promised and agreed to transport and deliver to the point of connection on the COUNTY trunk sewer * * *, all of the sanitary sewage and liquid wastes originating in the Sylvania Service Area, * * *." We found that the property owners were intended third-party beneficiaries to the contract between Sylvania and Lucas County. We also found that the 1973 agreement did not grant Sylvania the right to condition the extension of water and sewer services, to extraterritorial users, on the signing of an annexation covenant. Accordingly, we held that because "the performance of a duty one is already bound to perform cannot serve as consideration for a contract," the annexation covenants signed by the property owners were unenforceable insofar as they lacked consideration.Ralston at ¶ 34-35.
 {¶ 43} Appellants argue that although the city can impose conditions upon the extension of its services to extraterritorial users, once service has been extended, it cannot impose conditions on the continuation of such services. Appellants assert that because no agreement regarding annexation was required at the time of the extension of services to the properties, the city cannot later impose such a condition. Appellants argue that enforcement of the laws which arose after the city agreed to provide appellants' properties water and sewer services would result in an unconstitutional, retroactive application of those laws.
 {¶ 44} In the absence of a contractual duty to provide services, a city is permitted to impose conditions regarding the manner in which it will supply such services. See Indian HillAcres, 149 Ohio St. 461, paragraph three of the syllabus. Accordingly, only if the city was under a contractual duty to provide services to appellants' properties, was it required to continue to supply those services under the terms of that contract. Thus, the issue is whether the city contracted to provide appellants' properties with water and sewer services and, if it did, what were the terms of those contracts, when did they terminate, and was the city entitled to modify the terms under which the services would be provided.
 {¶ 45} There are no written agreements in evidence between the city and the property owners who owned appellants' properties at the time services were extended which set forth any conditions or terms regarding the city's or the property owners' obligations and duties regarding the supply of water and sewer services. The Bakies and Smith, in particular, argue that the county's agreement with Cavalear regarding the extension of water service to Willowbend establishes a duty on behalf of the city to continue providing such service. We, however, find that the contract contained no provisions regarding the supply of water to Willowbend residents and that the Bakies and Smith's reliance on this contract is therefore misplaced.
 {¶ 46} Even if we assume that, at the time services were extended to appellants' properties, the city had an oral agreement with the property owners regarding the supply of such services, we find that the city was entitled to terminate the terms of any original oral contract upon reasonable notice and, absent some other contractual duty to provide the services to appellants' properties, the city could impose conditions on extraterritorial users regarding their receipt of services from the city. See Fairway Manor, supra at 89, citing GrandviewHeights, supra, paragraph two of the syllabus; and Indian HillAcres, supra.
 {¶ 47} Insofar as the Bakies, GEM, Agri-Electronics, and Corporate Intelligence all signed agreements regarding their water and/or sewer services with the city, we find that any oral agreement that may have been in effect with respect to their properties was superceded by their written agreements. With respect to the remaining appellants, and any oral contracts that may have been in effect with the city regarding water service, we find that the city adopted an ordinance in 1982 which stated that every "person taking water shall be considered to have expressed his or her consent to be governed" by the rules of the division of water. Ordinance No. 33-82. Accordingly, even if an oral contract existed from the time water services were extended to appellants' properties, appellants were notified since 1982 that, if they chose to continue receiving water service, said service would be conditioned on them being governed by the rules set forth in P.C.O. 1060.06(b). Similarly, with respect to sewer service, since 1998, appellants were notified that their receipt of sewer services would be conditioned on them executing an agreement to annex. See Ordinance No. 150-98.
 {¶ 48} Appellants argue, however, that because there is no evidence that their oral contracts with the city allowed for the continuation of services to be conditioned on their executing an annexation agreement, such a condition is unenforceable. Appellants rely on City of Xenia v. Central State Univ. (2000),140 Ohio App.3d 65, in support of this argument. In Xenia, the municipality had a written contract for water service with the university since 1973, but no written contract regarding sewer service. When Xenia attempted to start charging the university late fees on the services it provided, the court held that because there was no evidence that the oral sewer contract provided for imposition of a late fee, the university was not obligated to pay any. We respectfully disagree with the holding of the Tenth District Court of Appeals in Xenia.
 {¶ 49} The Ohio Supreme Court has clearly held that "a municipality does not assume a duty to continue supplying water in perpetuity to extraterritorial customers merely by virtue of having once agreed to supply it" and, where a contract provides no termination date, either party to the agreement may terminate it upon reasonable notice. Fairway Manor, supra at 89. If an oral contract to provide utility services to extraterritorial users was never permitted to be altered, regardless of notice to the other party that the terms of the previous oral agreement would be terminated and new terms imposed, a city arguably could never increase its rates or impose any other conditions on a user's receipt of services. Accordingly, we find that the city's ordinances, which imposed new conditions on water and sewer recipients, put appellants on constructive notice that the prior terms of any alleged oral agreements they had with the city would be terminated and, that if they wished to continue receiving services, they would be subjected to the city's rules.
 {¶ 50} We recognize that in Grandview, the court stated that it was not reasonable notice of termination of a contract to merely adopt a city ordinance that provided for a rate increase in excess of the rates specified by the written contract between the parties. Grandview, 174 Ohio St. 473, paragraph three of the syllabus. We note, however, that unlike this case, the parties in Grandview had a written contract which specifically addressed the terms the city was attempting to alter through its ordinances. Moreover, the court held that 40 years was a reasonable duration for a contract providing for the transportation and treatment of sewage and, therefore, the parties' written contract was still in full force and effect.Grandview at 482.
 {¶ 51} No evidence has been presented in this case regarding what the terms of the alleged oral contracts provide. As such, we find that the city was entitled to terminate the terms of the alleged oral contracts upon reasonable notice to its users. The city notified its users in 1982 and 1998 that they would be subjected to the city's rules and regulations if they wished to continue receiving water and sewer services. Insofar as the city did not attempt to enforce any new conditions on the receipt of water and sewer services until 2002, we find that appellants were provided reasonable notice that any terms of their alleged oral agreements with the city were terminated. We therefore find that any appellant who is currently receiving services from the city pursuant to an oral contract, is subject to the city's ordinances that require annexation agreements in exchange for those services.
 {¶ 52} Regardless of the existence of any oral agreements, appellants additionally argue that the city had a contractual duty to provide its services to them pursuant to the city's contracts with Toledo, Wood County, and the NW Sewer District. Moreover, appellants assert that the city's duty to provide them services preexisted any attempt by the city to condition receipt of these services upon the execution of annexation agreements.
 {¶ 53} Specifically, with respect to water service, appellants assert that they are third-party beneficiaries to the 1952 and 1987 water agreements between the city and Toledo for the purchase of Toledo water. Because the city was obligated in the 1987 agreement to provide extraterritorial users within its water district with Toledo water, and because the 1987 agreement does not specify that the city can require an annexation agreement in exchange for the water it provides, appellants argue that there is no consideration for them to sign an annexation agreement. Appellants additionally argue that because the city had a duty to provide water service to them, prior to passing its ordinances requiring annexation agreements, any attempt to enforce these ordinances would be applied retroactively and, therefore, are unconstitutional.
 {¶ 54} Contrary to appellants' argument that the city obligated itself in its 1952 agreement with Toledo to provide extraterritorial users within its water district with Toledo water, we find that the city merely contracted for "the right to sell" the water it purchased from Toledo to consumers within or without its corporate limits. A "right" does not create an obligation. We do, however, find that the city obligated itself, pursuant to its 1973-1980 contract with the county, to furnish water to certain areas of the county, including Willowbend. This obligation, however, was conditioned upon the city's right to enforce, through the Superintendent of Water, any and all applicable rules and regulations "now or hereafter lawfully in effect in the city." Accordingly, we find that any water service supplied by the city pursuant to the 1973-1980 contract was conditioned upon the city's ability to enforce future rules regarding the furnishing of water.
 {¶ 55} Thereafter, in 1982, during a period when the city was under no written contractual duty to provide extraterritorial users with water, the city passed Ordinance No. 33-82, which set forth rules governing the division of water. See P.C.O. 1060.06(b). In the absence of a contractual duty to provide extraterritorial users with water, we find that the city was entitled to determine the conditions under which it would sell water to its extraterritorial users. See Indian Hill Acres,
supra, paragraph three of the syllabus.
 {¶ 56} In particular, the city adopted Rule 1, which states that the rules governing the division of water "shall be considered a part of the contract with every person, that is supplied with water through the water works system of the City, and every such person taking water shall be considered to have expressed his or her consent to be governed thereby." P.C.O. 1060.06(b), Rule 1. Based on this rule, we find that, regardless of any duty undertaken by the city after 1982 to provide water to extraterritorial users, all users were on notice since 1982 that by taking water from the city, they were subjecting themselves to governance by the rules of the division of water, P.C.O. 1060.06(b). Obviously, the rules of the division of water could, and do, encompass a requirement that annexation covenants be signed in exchange for water services.
 {¶ 57} Even assuming arguendo that the city obligated itself, pursuant to the 1987 agreement with Toledo, to provide extraterritorial users within its water district with Toledo water, and that appellants are third-party beneficiaries to that contract; we nevertheless find that any duty the city undertook to provide appellants with water was conditioned upon user compliance with the rules contained in P.C.O. 1060.06(b), including those which could subsequently be adopted by the city regarding annexation. It is the city's reservation in Rule 1, P.C.O. 1060.06(b) that distinguishes this case from Ralston,
supra.
 {¶ 58} In Ralston, we did not allow Sylvania to condition, after-the-fact, its duty to provide sewer services to extraterritorial users within its service area. In this case, however, prior to undertaking any duty pursuant to the 1987 contract, the city incorporated into its contracts with all water users the condition that they were subjected to the rules of the division of water. See P.C.O. 1060.06(b), Rule 1. Therefore, unlike the facts in Ralston, we find that the city had no preexisting, unqualified, duty to provide water service to appellants. Rather, appellants who were furnished with water from the city after 1982 were well aware that they would be subjected to the city's rules in exchange for their water use. Because the city's duty to provide water did not preexist its attempts to condition that duty, we find that no additional consideration is, or was, required in exchange for the annexation agreements sought by the city.
 {¶ 59} With respect to sewer services, we find that the city obligated itself through agreements with the county to provide sewer services to certain extraterritorial users from 1977 to 1982, and, then again, from 1984 to 1987. In the 1977 agreement, the city conditioned its duty to provide sewer services on its ability to enforce its rules and regulations, "now or hereafter lawfully in effect." In the 1984 agreement, the city again conditioned its duty to provide sewer services on its ability to enforce its rules concerning sewer use "now existing or as promulgated or modified in the future," and on the condition that users be subjected to all of the city's ordinances. After 1987, there is no evidence in the record of any agreement between the county and any other entity regarding the city's duty to provide sewer services to extraterritorial users. As such, we find that the city had no duty to provide sewer services to extraterritorial users at that time. See Indian Hill Acres,
supra, at paragraph three of the syllabus.
 {¶ 60} In 2001, however, the city undertook the duty to supply extraterritorial users within its service area with sanitary sewer services. As discussed above, we find that, prior to undertaking this duty, in 1998, the city placed appellants on notice that, if they wished to continue receiving sewer services, the city could require an annexation agreement. Ordinance No. 150-98. Any later duty undertaken by the city to provide sewer service to extraterritorial users was therefore conditioned by this ordinance. Again, this is not the situation in Ralston,
where Sylvania did not attempt to place conditions on its duty to provide sewer service until after it had already undertaken that duty.
 {¶ 61} Nevertheless, appellants argue that the city committed itself pursuant to Plan 208, promulgated in 2001, to continue to provide sewer services to appellants. In part, the plan stated:
 {¶ 62} "Once an area has sanitary sewage service as part of an FPA, it shall continue to be served by the wastewater treatment facility except: when the wastewater facility is no longer able to meet its NPDES permit requirements due to extraneous water, unanticipated growth, or treatment quality problems or by mutual agreement of the DMAs."
 {¶ 63} The city asserts that Plan 208 was not an agreement, but a planning document to develop comprehensive programs for the collection and treatment of water. As such, the plan does not constitute a contractual obligation by the city to unconditionally provide sewer services to appellants. We agree. Not only does Plan 208 not contractually bind the city, if it did, the city would have no recourse to discontinue service even for nonpayment or noncompliance with any other sanitary sewer system regulations. This would be absurd. Moreover, we note that the August 2001 contract with the district specifically provided that the city's agreement regarding sewer services was not to be interpreted or applied so as to limit the city's annexation rights.
 {¶ 64} With respect to appellants' argument that the city is applying its ordinances retroactively, we note that Article II, Section 28, Ohio Constitution, states that "[t]he general assembly shall have no power to pass retroactive laws, or laws impairing the obligation of contracts." The city is not the "general assembly" and, therefore, its ordinances arguably cannot be in violation of the Ohio Constitution. Regardless, we find that the city is not applying its ordinances retroactively. Only if there was an existing contract in effect to which the city was attempting to apply its ordinances, could there even be a basis for finding retroactive application of the city's ordinances. As discussed above, we find that the city simply was not under any contractual duty to provide water or sewer services at the time it passed Ordinance Nos. 33-82 and 150-98. Thus, the ordinances could only apply prospectively to future agreements the city entered into with or on behalf of its extraterritorial users.
 {¶ 65} Appellants additionally argue, however, that because the city asserts the right to be the exclusive supplier of water and sewer services, it cannot discriminate against users within its water district and service area. In support of their argument, appellants rely on Western Reserve, supra. In particular, appellants argue that when a municipality asserts that it has the exclusive right to supply services to areas lying outside its city limits, it does so with the restricted authority of a public utility and, therefore, it is "`shorn of sovereign prerogative' to impose whatever conditions it chooses on continuation of water to users within the exclusive service area." Appellants further argue that the city does not have "`absolute power to impose whatever conditions it chooses * * *'," citing, Koenig, supra. Because the 1987 agreement with Toledo, regarding water service, and the 2001 agreements regarding sewer services, did not grant the city the right to condition its services on the signing of an annexation agreement, appellants argue that it would be discriminatory and unlawful to require appellants to now execute such an agreement in exchange for continued services. We disagree.
 {¶ 66} Assuming arguendo that the city has undertaken the responsibility of providing all extraterritorial users within its areas with water and sewer services, we find that the city's requirements regarding annexation are not discriminatory or unlawful. As we have previously held, mandating annexation agreements by non-residents, as a condition to receiving city services, is a valid exercise of a municipality's police power.Andres, 47 Ohio App.3d at 53. The city has established that its desire to annex portions of the surrounding areas is economic in nature. The city desires room to grow and expand its tax base. These are legitimate city interests. See Shipman v. Lorain Cty.Bd. of Health (1979), 64 Ohio App.2d 228.
 {¶ 67} Moreover, we find that the city's rules are not discriminatory insofar as they apply to all extraterritorial users within the city's service areas equally. Appellants argue that only requiring certain extraterritorial users to annex and not others is discriminatory. We disagree. Mayor Holbrook testified that the city established a plan to annex areas in phases. For example, the first phase was chosen because the residents in that area needed a fire station. The city could provide one more cost effectively for the taxpayers than the township. Merely because the city seeks or agrees to annex certain areas before others does not make the city's plan regarding annexation discriminatory. Despite when the city seeks to enforce its right to annex property, all users are subject to the identical requirements contained in P.C.O. 1060.06(b); and P.C.O. 1040.07(c).
 {¶ 68} Furthermore, we note that the situation in WesternReserve is not akin to the facts in this case. In WesternReserve, a village resident was denied water service because of a preexisting water debt, incurred by the prior owner. The resident was not legally obligated to pay the debt, nor had it agree to do so. The denial of water to a resident on these grounds was found to be discriminatory and unlawful. In this case, appellants are not city residents and the city did not undertake an unqualified obligation to provide them water and sewer services. Moreover, by receiving or continuing to receive water service after 1982, and sewer services after 1998, appellants implicitly agreed to be governed by the rules of the city, which include requirements regarding annexation. See P.C.O. 1060.06(b); and P.C.O. 1040.07(c). Accordingly, we find appellants' reliance on Western Reserve is misplaced.
 {¶ 69} Appellants further argue that the city is barred from terminating water and sewer services based on matters which are collateral to supplying those services, such as annexation. We disagree that the city's rules regarding annexation in exchange for providing water and sewer services to extraterritorial users is a matter that is "collateral" to providing such services. Requiring an annexation agreement in exchange for city services is reasonably related to a city's aim to regulate nearby growth and protect its tax base. See Shipman, supra. Without a plan regarding the spread of development in areas outside the city limits, the city could overextend its resources and place its residents in jeopardy. There is no evidence that the city is unable to meet the demands of its users at this time; nevertheless, we find that requiring annexation agreements in exchange for providing water and sewer services is a valid exercise of the city's authority, and squarely within the realm of proper management of the city's water and sewer systems.
 {¶ 70} Finally, appellants argue that the city's effort to condition their continued receipt of water and sewer services on their signing annexation agreements is unreasonable, arbitrary and capricious, bears no legitimate and rational relationship to the health, safety and welfare of the citizens of the city, is not supported by public policy, would injuriously affect appellants' ability to use their properties, and does not provide appellants sufficient notice. As we have previously held, mandating annexation by nonresidents, as a condition to receiving city services, is a valid exercise of a municipality's police power. Andres, 47 Ohio App.3d at 53. Moreover, assuming arguendo, that the city has to establish a legitimate and rational relationship to the health, safety and welfare of its citizens, we find that it sufficiently made such a demonstration in its 1988 resolution concerning its annexation policy. See Resolution 15-88.
 {¶ 71} With respect to appellants' argument that the city's attempt to enforce annexation would harm their properties, and did not provide appellants with reasonable notice of the city's intentions, we find that appellants have been on notice since 1998 that non-compliance with the city's ordinances regarding annexation could result in termination of water and sewer services. Appellants could have made alternative arrangements for their services since 1998, but failed to do so. As such, we find appellants' arguments not well-taken.
 {¶ 72} Based on the foregoing, we make the following findings with respect to the Bakies and Smith. We find that the 1998 agreement signed by the Bakies is enforceable against them. Any obligation the city undertook to supply the Bakies with water was conditioned, since 1982, on their being governed by the rules of the division of water. At the time the Bakies executed their annexation agreement, such an agreement was required by city ordinances in order to receive water services. Accordingly, we find that the city can lawfully terminate the Bakies' water service if they fail to comply with the provisions of their signed agreement and P.C.O. 1060.06(b).
 {¶ 73} With respect to Smith, regardless of what agreement he believes existed between him and the city regarding the supply of water service to his property, we find that by continuing to receive water after 1982, Smith implicitly agreed to be governed by the rules of the division of water. See Ordinance No. 33-82. Moreover, we find that any other contracts existing between the city and the township, or Toledo, which obligated the city to supply water service to Smith were conditioned upon Smith's being governed by P.C.O. 1060.06(b). In 1998, the city amended P.C.O. 1060.06(b) by requiring that, in order to continue receiving water service, when notified, "any person presently receiving" water service is required to comply with Rule 62(e) by executing an agreement to annex their property to the city, sign a petition for annexation, and require a similar agreement from subsequent owners. Ordinance No. 151-98. Accordingly, we find that the city can lawfully terminate Smith's water service if he fails to comply with the provisions of P.C.O. 1060.06(b).
 {¶ 74} We therefore find that the Bakies and Smith's three assignments of error are not well-taken. The city is entitled to enforce its agreement with the Bakies and its ordinances against Smith. The trial court therefore correctly determined that the city can require the Bakies and Smith to sign an annexation petition or risk discontinuation of their water services provided by the city. As such, we find that the trial court correctly granted the city's motion for summary judgment and properly denied the Bakies' and Smith's motion for summary judgment.
 {¶ 75} With respect to the GEM appellants who never signed any agreement with the city regarding water or sewer services, we find that they, like Smith, can be required to abide by the city's ordinances or risk discontinuation of their services. Regardless of any oral agreement that may have existed between them, or prior owners of their property, and the city regarding the supply of water and sewer services, we find that by continuing to receive water after 1982, and sewer service after 1998, these appellants agreed to be governed by the rules of the division of water and consented to the provisions contained in P.C.O. 1040.07(c), Rule 33, and P.C.O. 1060.06(b), Rule 61. Moreover, we find that any other contracts existing between the city and the township, Toledo, or the NW Sewer District, which obligated the city to supply water and sewer services to these appellants, were preconditioned on the city's ability to enforce the provisions of its ordinances. We therefore find that the city can lawfully terminate these appellants' water and sewer services if they refuse to comply with the provisions of P.C.O. 1040.07(c) and P.C.O. 1060.06(b).
 {¶ 76} With respect to GEM, Agri-Electronics, and Corporate Intelligence, they each signed a service agreement which provided that they agreed "to comply with all rules and regulations of the Divisions of Water and Water Pollution Control and other Servicerelated regulations as adopted by the City of Perrysburg." Each agreement was signed between 1984 and 1987. During that time, the city had obligated itself to provide water and sewer services, but had conditioned its duty by requiring that all users "shall at all times be subject to all of the resolutions, ordinances and general rules and regulations of the county and the city." Accordingly, we find that these agreements are enforceable against these three property owners. See Koenig andAndres, supra.
 {¶ 77} Appellants, however, argue that they are only obligated, pursuant to these service agreements, to comply with the rules and regulations that existed at the time they entered into their service agreements. Appellants rely on Xenia, supra, in support of this argument.
 {¶ 78} In Xenia, the written contract with the university stated that "the rules and regulations of the Water Department of the City of Xenia, Ohio, and all applicable City Ordinances applying to the use or sale of water by the City shall be considered to be a part of this contract." Xenia,140 Ohio App.3d at 72. The Tenth District Court of Appeals held that this provision only intended to incorporate into the water contract the ordinances that were in effect when the contract became effective in 1972. The court reasoned that had the drafters intended to incorporate later versions of the city's ordinances, then they would have provided for such, as they did in other paragraphs of the agreement. Id. Unlike the agreement in Xenia,
we find that there is no such disparity with the language contained in the service agreements between appellants and the city and, therefore, find that appellants' reliance on Xenia is misplaced. Moreover, the contract language in appellants' service agreement specifically states that appellants agree to comply with the rules "as adopted" by the city. We find that this language clearly incorporates future rules into appellants' contract with the city.
 {¶ 79} Appellants make an additional argument, however, that they are only required to abide by "service-related" regulations because of the language of their agreement. Specifically, appellants argue that the phrase "other service-related regulations" modifies the phrase "rules and regulations of the Division of Water and Water Pollution Control" to mean that only service-related regulations are enforceable against them. We disagree. Appellants contracted for the receipt of water and sewer services, in exchange, they agreed to comply with all the rules and regulations of the Divisions of Water and Water Pollution Control as adopted by the city. If, however, other regulations regarding water or sewer service were promulgated by a division other than the Divisions of Water and Water Pollution Control, then appellants would also be required to comply with those regulations.
 {¶ 80} Appellants agreed to abide by the city's rules and regulations regarding water and sewage in exchange for receiving these services. The city's rules require that they comply with the city's request to have them sign an annexation petition, or risk discontinuation of their services. See Ordinance Nos. 150-98 and 151-98. Accordingly, we find that the city is entitled to enforce its ordinances against these appellants pursuant to their agreement to comply with the city's rules.
 {¶ 81} We therefore find that the trial court correctly granted the city's motion for summary judgment against the GEM appellants and properly denied the GEM appellants' motion for summary judgment. GEM appellants' first assignment of error is therefore found not well-taken.
 {¶ 82} The GEM appellants argue in their second assignment of error that the trial court erred in ordering them to sign an annexation petition. Rather, the GEM appellants argue that they have the right to choose whether or not to comply with the city's ordinances, and cannot be forced to do so. We agree. Obviously, appellants' failure to comply with the city's ordinances could result in termination of appellants' services; however, we find that the trial court was without the authority to force appellants to sign annexation petitions. The GEM appellants' second assignment of error is therefore found well-taken.
 B. The City's Cross-Appeal {¶ 83} The trial court granted the city summary judgment on May 30, 2003, which was journalized on June 2, 2003, and held that "all plaintiffs/counterclaim defendants be, and are hereby ordered to each sign the annexation petition within 60 days of the filestamped date on this order and otherwise exert all efforts to pursue annexation of his or her property to the City of Perrysburg." On June 27, 2003, appellants appealed the trial court's decision.
 {¶ 84} On July 23, 2003, appellants sought injunctive relief from this court. Specifically, appellants requested this court to prohibit the city from discontinuing water service to anycustomer who refused to sign an annexation petition during the pendency of this appeal. This court entered an order on July 23, 2003, enjoining the city from discontinuing water and sewer service to appellants during the pendency of this appeal and from using appellants' signatures in support of annexation.
 {¶ 85} On August 15, 2003, the trial court entered a judgment entry that modified its May 30, 2003 decision, in part, by ordering that the city was prohibited from sending letters to "any current water users similarly situated to Plaintiffs on the basis of the annexation requirement for water service during the pendency of the appellate process," and from using "any annexation petition signatures" obtained as a result of the trial court's May 30, 2003 order, "until the appellate process has been completed."
 {¶ 86} The city argues in its cross-appeal that (1) the trial court lacked jurisdiction to modify its judgment entry after appellants had filed their notice of appeal; (2) the trial court violated the law of the case doctrine when it substantively modified its judgment entry after the appellate court had issued its injunction pending appeal; (3) the trial court erred when it substantively modified its judgment entry in a manner which was inconsistent with the injunction previously issued by the appellate court; and (4) the trial court erred when it enjoined the city from pursuing enforcement of its ordinances, rules and agreements with respect to persons who were not parties to the action before it. We agree.
 {¶ 87} The August 15, 2003 judgment entry clearly sought to modify the terms of its May 30, 2003 judgment entry. The trial court was without jurisdiction to modify its prior judgment while the matter was pending on appeal before this court. Additionally, the trial court erroneously sought to modify this court's July 23, 2003 decision and judgment entry. And, in any event, the August 15, 2003 judgment entry of the trial court clearly exceeded the scope of the case it had before it. No property owners other than appellants were parties to this action. It was incorrect for the trial court to attempt to enjoin the city with respect to persons who were not a party to the action.
 {¶ 88} Accordingly, we find the city's assignments of error well-taken. The trial court's August 15, 2003 judgment entry is therefore vacated and found to be void.
 CONCLUSION {¶ 89} On consideration whereof, this court finds that the city of Perrysburg, Mayor Jody G. Holbrook, and Douglas Guest are entitled to summary judgment against Gregory and Karen Bakies, Richard Smith, GEM Properties, Inc., Robert Bettinger, Corporate Intelligence Consultants, Inc., Helwil, LLC, Matt Star Ltd., Wellman Rental and Supply, Inc., and Welded Construction, LP. We further find that appellants are not entitled to summary judgment against the city. Accordingly, we affirm the trial court in this respect.
 {¶ 90} We, however, reverse the trial court with respect to its order that the appellants are required to each sign an annexation petition. Clearly, appellants are permitted to choose whether or not to comply, even though their failure to comply could result in the city's terminating their services. The trial court was without any authority to force appellants to sign the annexation petitions. We also reverse the trial court's August 15, 2003 judgment entry and vacate it in toto. Pursuant to App.R. 24, costs are assessed to appellants.
Judgment Affirmed, In Part and Reversed, In Part.
Knepper, J., Lanzinger, J., Singer, J., Concur.
[1] The GEM appellants consist of GEM Properties, Inc., Robert Bettinger (Agri-Electronics Systems, Inc.), Corporate Intelligence Consultants, Inc., Helwil, LLC, Matt Star Ltd., Wellman Rental and Supply, Inc., and Welded Construction, LP.
[2] P.C.O. 1060.06(c) was recodified in 1988 as P.C.O. 1040.07(c).
[3] The amended rules state, in pertinent part, the following:
Section 1040.07(c) of the Codified Ordinances of the City of Perrysburg:
"Rule 33. No sanitary sewer service shall be extended to any sanitary sewer users outside the corporate limits of the City except under the conditions set forth in Rules 34, 35 and 36. Provided, further, that any person presently receiving sanitary sewer service from the City shall, upon notice from the City, immediately comply with the provisions of Rule 34(e). Failure to comply with such policy shall result in the sanitary sewer service being terminated 60 days from the date of notice.
"Rule 34. The City may extend water service to land which is outside of the corporate limits of the City but within the City's sanitary sewer service area provided that before such sanitary sewer service is extended, the owner of such land will comply with the following: * * *
"(e) Execute an agreement to annex the property to the City or a petition for annexation to the City, as determined by the City. Such owner shall exert all efforts to obtain annexation of his or her property, including, if requested by the City, signing an annexation petition. In the case of an agreement to annex to the City, the owner of such land must also agree to require a similar agreement from anyone to whom he or she sells all or any part of his or her land"
Section 1060.06(b) of the Codified Ordinances of the City of Perrysburg:
"Rule 61. No water service shall be extended to any users outside the corporate limits of the City except under conditions set forth in Rules 62, and 63. Provided, further, that any person presently receiving water service from the City shall, upon notice from the City, immediately comply with the provisions of Rule 62(e). Failure to comply with such policy shall result in the water service being terminated 60 days from the date of notice.
"Rule 62. The City may extend water service to land which is outside of the corporate limits of the City but within the City's water service area provided that before such water service is extended, the owner of such land must comply with the following: * * *
"(e) Execute an agreement to annex the property to the City or a petition for annexation to the City, as determined by the City. Such owner shall exert all efforts to obtain annexation of his or her property, including, if requested by the City, signing an annexation petition. In the case of an agreement to annex to the City, the owner of such land must also agree to require a similar agreement from anyone to whom he or she sells all or any part of his or her land"